**Nos. 24-6256, 24-6274**

# In the United States Court of Appeals for the Ninth Circuit

EPIC GAMES, INC.,

*Plaintiff-Appellee,*

*v.*

GOOGLE LLC; GOOGLE IRELAND, LTD.; GOOGLE COMMERCE,
LTD.; GOOGLE ASIA PACIFIC PTE, LTD.; GOOGLE PAYMENT CORP.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of California,
Nos. 3:20-cv-05671-JD, 3:21-md-02981-JD

**BRIEF OF AMICI CURIAE NETCHOICE AND
CHAMBER OF PROGRESS SUPPORTING DEFENDANTS-
APPELLANTS' MOTION FOR STAY PENDING APPEAL**

Scott A. Keller
Steven P. Lehotsky
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW
Washington, DC 20001
(512) 693-8350
scott@lkcfirm.com

Drew F. Waldbeser
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305

# CORPORATE DISCLOSURE STATEMENT

Nos. 24-6256, 24-6274

EPIC GAMES, INC.,

*Plaintiff-Appellee*,

*v.*

GOOGLE LLC; GOOGLE IRELAND, LTD.; GOOGLE COMMERCE,
LTD.; GOOGLE ASIA PACIFIC PTE, LTD.; GOOGLE PAYMENT CORP.,

*Defendants-Appellants*.

Under Federal Rule of Appellate Procedure 26.1, NetChoice certifies that it has no parent corporation, and that no publicly held company owns 10% or more of its stock.

Under Federal Rule of Appellate Procedure 26.1, Chamber of Progress certifies that it is a nonprofit entity organized under Section 501(c)(6) of the Internal Revenue Code created in and existing under the laws of Virginia and has no parent corporation. No publicly held company owns 10 percent or more of Chamber of Progress. A full list of Chamber of Progress' partners is available at https://perma.cc/K5NA-FSTS.

*/s/ Scott A. Keller*
Scott A. Keller
*Counsel for Amici Curiae*

i

## TABLE OF CONTENTS

Corporate Disclosure Statement ............................................................i

Table of Contents ................................................................................ ii

Table of Authorities ........................................................................... iii

Interest of Amici Curiae ......................................................................1

Introduction ........................................................................................2

Argument .............................................................................................4

    I.   The district court's injunction will stifle app store competition for developers and users, threatening the health of the app economy. .......................................................4

   II.   This Court should maintain the status quo by granting a stay pending appeal, given the injunction's unprecedented scope and sweeping consequences. .......................................10

Conclusion ..........................................................................................13

Certificate of Service ..........................................................................14

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atl. Richfield Co. v. USA Petroleum Co.,*
 495 U.S. 328 (1990)...................................................................6

*Copperweld Corp. v. Indep. Tube Corp.,*
 467 U.S. 752 (1984)...................................................................7

*Epic Games, Inc. v. Apple Inc.,*
 559 F. Supp. 3d 898 (N.D. Cal. 2021) ......................................5

*Epic Games, Inc. v. Apple, Inc.,* 67 F.4th 946 (9th Cir. 2023) ...............5

*Image Tech. Servs., Inc. v. Eastman Kodak Co.,*
 125 F.3d 1195 (9th Cir. 1997)..................................................12

*Massachusetts v. Microsoft Corp.,*
 373 F.3d 1199 (D.C. Cir. 2004)................................................11

*NCAA v. Alston,*
 594 U.S. 69 (2021).................................................2, 6, 10, 12

*New York v. Microsoft Corp.,*
 224 F. Supp. 2d 76 (D.D.C. 2002)............................................11

*Novell, Inc. v. Microsoft Corp.,*
 731 F.3d 1064 (10th Cir. 2013).......................................3, 7, 8, 10, 11

*Saint Alphonsus Med. Ctr. Nampa Inc. v. St. Luke's Health Sys.,
 Ltd.,*
 778 F.3d 775 (9th Cir. 2015).....................................................11

*United States v. Syufy Enters.,*
 903 F.2d 659 (9th Cir. 1990)......................................................7

## Other Authorities

Abhineet Kaul, et al., *Powering the global app economy: Android and Google Play's contributions,* Access Partnership (April 9, 2024), https://perma.cc/PGZ4-78KZ ...................................................4

The App Association, *State of the App Economy* (2022), https://perma.cc/Y2K9-26UG .....................................................3, 4

Apple, *App Store developers generated $1.1 trillion in total billings and sales in the App Store ecosystem in 2022* (May 31, 2023), https://perma.cc/B8WZ-MXME ...................................................5

Daniel Castro, *Banning "Closed" Mobile Ecosystems Would Hurt Consumer Choice and Competition,* Information Technology & Innovation Foundation (Jan. 23, 2022), https://perma.cc/3FUR-GTNM...................................................6

Google, *Helping Developers Succeed*, https://perma.cc/F5PK-9ZHV.............................................................................................7

Google, *How we fought bad apps and bad actors in 2022* (April 27, 2023), https://perma.cc/9FK3-F4L6 ...............................................5

Google Play, *Android vitals*, https://perma.cc/R9JV-X2BU;.............................8

Google Play, *Build a high-quality app or game*, https://perma.cc/253K-76E8................................................................8

Google Play, *Grow your audience*, https://perma.cc/R8GW-U7A7...................8

Matt Au & Bret Swanson, *Mobile App Stores Are Economic Engines. Should Policymakers Be Redesigning Them?*, AEI (March 9, 2021), https://perma.cc/6GZ3-B9AQ .........................................5

Michael Mandel and Jordan Shapiro, *U.S. App Economy Update, 2022*, Progressive Policy Institute (May 2022), https://perma.cc/33QK-5RZF...........................................................4

iv

*Mobile Ecosystems Would Hurt Consumer Choice and Competition*,
Information Technology & Innovation Foundation (Jan. 23,
2022), https://perma.cc/3FUR-GTNM ............................................................6

Samuel Axon, *Google undercuts Apple with new 15% revenue share
for Play apps*, Ars Technica (Mar. 16, 2021),
https://perma.cc/P9YC-4EJX ............................................................6

## INTEREST OF AMICI CURIAE

NetChoice is a national trade association of online businesses that share the goal of promoting free enterprise and free expression on the Internet.[1] NetChoice fights to ensure the internet remains innovative and free. Toward those ends, NetChoice engages in litigation, amicus curiae work and political advocacy.

Chamber of Progress is a tech-industry coalition devoted to a progressive society, economy, workforce, and consumer climate. Chamber of Progress backs public policies that build a fairer, more inclusive country in which the tech industry operates responsibly and fairly, and in which all people benefit from technological leaps. Chamber of Progress seeks to protect internet freedom and free speech, to promote innovation and economic growth, and to empower technology customers and users.

In this case, the district court issued a permanent injunction commanding Google to distribute competing app stores through the Play store and share Google's entire app library with those competitors. That unprecedented injunction will undermine competition between app stores, dampen

---

[1] No counsel for any party authored this brief in whole or in part, and no entity or person, aside from amici curiae, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E). Counsel for Appellants and Appellee consent to the filing of this amicus brief. *See* Fed. R. App. P. 29(a)(2).

innovation, and harm consumers. Given the critical importance of the app economy, amici submit this brief to urge this Court to maintain the status quo by staying the injunction while the appeal proceeds.

## Introduction

"When it comes to … antitrust remed[ies], … caution is key." *NCAA v. Alston*, 594 U.S. 69, 106 (2021). Antitrust injunctions, in particular, often "wind up impairing rather than enhancing competition." *Id.* at 102.

That is precisely what the district court's injunction would do. The injunction goes far beyond prohibiting conduct that may hinder start-up app stores from competing. Rather, the court ordered Google to affirmatively distribute rival app stores through the Google Play store *and* to give those rival app stores access to Google's entire library of apps. Inj. at 2-3, Dkt. 6.2, Ex. B.[2] The court identified no instances where a court required a company to not only host and disseminate its competitors but also stock the shelves of their virtual stores. This unprecedented injunction would "suppress procompetitive innovation." *NCAA*, 594 U.S. at 102.

Any judicial decree re-engineering the app economy risks upending an irreplaceable driver of economic growth and innovation. Every year, the app economy is responsible for hundreds of billions of dollars of economic value

---

[2] Citations to "Dkt." refer to appellate filings in Nos. 24-6256 and 24-6274. Citations to "ECF" refer to the multidistrict litigation docket, No. 3:21-md-02981-JD (N.D. Cal.).

2

and hundreds of thousands of new jobs, many with small businesses. The App Association, *State of the App Economy* at 3, 9-10 (2022), https://perma.cc/Y2K9-26UG. This economic success story is the direct result of competition between app stores, especially the Google Play store and Apple's iOS App Store.

But the district court's injunction forcibly distorts the app economy by eliminating incentives for rival app stores to compete. The injunction allows rivals to free-ride on Google's efforts to develop a thriving app library. Rather than incentivize competition to attract developers and improve the user experience, the injunction essentially guarantees a homogenous app store landscape. That is the opposite of healthy competition. Even the district court acknowledged that the injunction's competitor-distribution and catalog-sharing requirements will at least temporarily "reduce[] competition." May 23, 2024, Hearing Tr. at 51, ECF 977. That result is "inconsistent with the goals of antitrust." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1073 (10th Cir. 2013) (Gorsuch, J.).

Despite the injunction's immense economic stakes and unprecedented scope, the district court gave Google only eight months to comply with the competitor-distribution and catalog-sharing requirements—and just weeks to comply with provisions altering Google's contractual relationships with hundreds of thousands of third parties. Instead of allowing this ill-advised injunction and its far-reaching consequences to take effect, the Court should

grant a stay to preserve the current competitive app economy while the appellate process runs its course.

## ARGUMENT

## I. The district court's injunction will stifle app store competition for developers and users, threatening the health of the app economy.

The mobile app economy is an irreplaceable economic engine that drives growth and innovation. Millions of users and developers depend on it. But the district court's injunction threatens to distort competition in this important market by creating a homogenized app store economy.

The mobile app economy is an "engine of growth" and "backbone of innovation" for the American economy. *State of the App Economy*, *supra*, at 5, 8. Between 2019 and 2022, the app economy grew by 15% and reached $1.8 trillion in economic value. *Id.* at 3, 5. The app economy is particularly important for small businesses, which build 90% of all apps. *Id.* at 6-7. In 2022, the app economy was responsible for over 2.5 million jobs—a 14% increase from April 2019. Michael Mandel and Jordan Shapiro, *U.S. App Economy Update, 2022*, at 4, 9, Progressive Policy Institute (May 2022), https://perma.cc/33QK-5RZF.

The Google Play store has been a "key driver[] of this growth, fostering a booming app ecosystem." Abhineet Kaul, et al., *Powering the global app economy: Android and Google Play's contributions*, Access Partnership (April 9, 2024), https://perma.cc/PGZ4-78KZ. The Play store has over 100 million users and 3.2 million apps produced by over 1 million developers. Baccetti

4

Decl., ¶ 7, ECF 981-1. The Play store is thriving because it fosters "a safe and secure environment for app developers and consumers to interact online." *Powering the global app economy, supra; see also* Google, *How we fought bad apps and bad actors in 2022* (April 27, 2023), https://perma.cc/9FK3-F4L6 (Google's content moderation "prevented 1.43 million policy-violating apps from being published" and "over $2 billion in fraudulent and abusive transactions" in 2022).

This Android-device app market is just a "submarket" of the broader app distribution market. *See Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 987, 1024-25 (N.D. Cal. 2021), *aff'd on this ground, rev'd in part and remanded on other grounds*, 67 F.4th 946 (9th Cir. 2023) (rejecting the argument that Apple is a monopolist because, among other reasons, the iOS App Store "competes against other platforms for both consumers and developers"). The iOS App Store has nearly 1.8 million apps and hundreds of millions of users. Apple, *App Store developers generated $1.1 trillion in total billings and sales in the App Store ecosystem in 2022* (May 31, 2023), https://perma.cc/B8WZ-MXME.

The district court ignored this broader competition, which has produced a vibrant app economy. "[C]onsumers and the economy are winning big" because Google and Apple compete to offer premium app store experiences and thus attract users to the Android and iOS ecosystems. *See* Matt Au & Bret Swanson, *Mobile App Stores Are Economic Engines. Should Policymakers Be Redesigning Them?*, AEI (March 9, 2021), https://perma.cc/6GZ3-B9AQ. For

instance, Google recently lowered its revenue-sharing fee on the "first $1 million in annual Google Play revenue … that a developer earns" to 15%. Samuel Axon, *Google undercuts Apple with new 15% revenue share for Play apps*, Ars Technica (Mar. 16, 2021), https://perma.cc/P9YC-4EJX (explaining this change significantly boosts "the fortunes of independent developers or small companies"). Google and Apple also compete for users by offering "two very different types of mobile ecosystems"—open and closed, respectively. Daniel Castro, *Banning "Closed" Mobile Ecosystems Would Hurt Consumer Choice and Competition*, Information Technology & Innovation Foundation (Jan. 23, 2022), https://perma.cc/3FUR-GTNM. This competition "is good for consumers" and developers because "it gives them more choices and … encourages each [store] to address the benefits of its alternative." *Id.*

But the district court's injunction threatens the health of this thriving app economy. Under normal competitive conditions, alternative app stores attempt to attract developers and users by finding innovative ways to *distinguish* themselves from the Google Play store. This injunction, however, will homogenize the app store landscape, thus "reduc[ing]" healthy competition, not bolstering it, as the district court recognized. *See* May 24, 2024, Hearing Tr. at 51, ECF 977. That is bad for users, developers, and the many companies relying on a healthy app ecosystem.

"The antitrust laws were enacted for 'the protection of *competition*, not *competitors*.'" *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990) (citation omitted). Courts therefore should ensure judicial decrees do not

"unintentionally suppress procompetitive innovation." *NCAA*, 594 U.S. at 102. In particular, an injunction that requires competitive rivals to cooperate rather than compete "reduc[es] the incentive both sides have to innovate, invest, and expand—… results inconsistent with the goals of antitrust." *Novell*, 731 F.3d at 1073. After all, the "antitrust laws are designed to protect the integrity of the market system by assuring that competition reigns freely." *United States v. Syufy Enters.*, 903 F.2d 659, 663 (9th Cir. 1990). "[C]oncerted behavior" between competitors "deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768-69 (1984). Cooperation between rivals "reduces the diverse directions in which" innovation occurs and "suddenly increases the economic power moving in one particular direction." *Id.* at 769. Because such remedies are "fraught with anticompetitive risk," they "warrant scrutiny." *Id.* at 768-69.

The injunction here fails that scrutiny. By design, it allows rival app stores to advertise and distribute their rival app stores to the Play store's massive user base, then fill those rival app stores with the Play store's extensive app library. The injunction thus requires Google to share with competitors features of the Play store that are the direct result of its hard work and innovation.

Developers often choose the Play store because it offers the broadest reach, robust security, and streamlined development tools. The Google Play Academy "is a free e-learning platform for developers, business people, and

marketers of Google Play apps and games." Google, *Helping Developers Succeed*, https://perma.cc/F5PK-9ZHV. Developers may "[l]everage Google Play's closed or open testing infrastructure to build out . . . features with feedback from real users." Google Play, *Build a high-quality app or game*, https://perma.cc/253K-76E8. The Google Play store likewise allows developers to "[m]onitor and improve the technical quality of [their] app or game" with real-time "reports on key user-impacting issues." Google Play, *Android vitals*, https://perma.cc/R9JV-X2BU; *see also* Google Play, *Grow your audience*, https://perma.cc/R8GW-U7A7 (identifying other "reporting and optimization tools … exclusive to Google Play"). These features are particularly beneficial for small developers.

Yet the injunction forces Google to "help competitors" by "sharing [Google's] property"—access to the many developers and apps that Google's innovations have attracted. *Novell*, 731 F.3d at 1073. Rival app stores need not "innovate[e] or expand[]" by offering developers better training, beta testing resources, or optimization and engagement metrics. *Id*. They can simply "piggyback on [their] larger rival" and offer the same library of 3.3 billion apps, with no effort. *Id.* The injunction all but guarantees a glut of new app stores that will carbon copy the Play store's library but fail to offer developers new features or benefits. Motion for Stay ("Mot.") at 17, 27, Dkt. 6.1. That is a "paradigmatic antitrust wrong[]." *Novell*, 731 F.3d at 1073.

The injunction will similarly reduce competition among rival app stores to improve the user experience. App stores compete to improve the user experience because, as the district court recognized, "the greater the number of developers" for an app store, "the greater the number of users, and vice versa." Order at 10, Dkt. 6.2, Ex. A. Google thus works hard to create an optimized and pleasant user experience through, for instance, a curated app library and effective security protocols. *E.g.*, Kleidermacher Testimony, Tr. 1757:4-16, 1758:23-1759:8; Mot. at 22-23.

The injunction hands new app stores full access to the apps and developers on the Google Play store, eliminating the need to compete for apps and users. Rival app stores need not invest in a user-friendly, secure app store infrastructure. They can simply rely on the Google Play store's moderation and curation of its library, with no incentive to improve on those efforts. *See* Mot. at 17. This mandated access to the Google Play store's entire library will likewise discourage the development of niche or specialized app stores, further reducing consumer choice. As Epic's own expert explained, the best way for an alternative app store to compete with Google and benefit users is to "offer distinctive content not available on the Google Play Store." Bernheim Statement, ¶ 48, ECF 952-1. When app stores innovate to differentiate themselves, users benefit from a wider array of choices, lower prices, improved features, and enhanced services. A homogenized app store landscape is the opposite of meaningful competition. But that is what the injunction will produce.

9

The injunction also suppresses *Google's* incentive to continue innovating. Under normal competitive conditions, Google has compelling reasons to find new ways to induce developers to list apps on the Play store. But if Google must "share" every app it attracts with rival app stores, Google has less reason to "invest[], innovate[], or expand[]." *Novell*, 731 F.3d at 1073. If Google attracts new users to the Play store, that will merely increase the potential traffic being directed to rival app stores. Likewise, the injunction requires Google to create the technology to share its app catalog with any third-party app store, complete downloads of apps for users of third-party app stores, and allow developers to opt out. Google Proffer at 3-12, ECF 981. Compliance with each of these requirements will require time and resources that Google could otherwise devote to improving the Play store. *See* Mot. at 25-26.

The injunction will therefore stifle innovation in the app distribution market rather than foster healthy competition. This will harm consumers and developers, who will face a stagnant app store market with fewer innovations.

## II. This Court should maintain the status quo by granting a stay pending appeal, given the injunction's unprecedented scope and sweeping consequences.

This Court should maintain the status quo while the full appellate process occurs, given the injunction's significant consequences for the app distribution market.

10

"[C]aution is key" when "fashioning … antitrust remed[ies]," so that the "heavy hand of judicial power" does not undermine "consumer welfare." *NCAA*, 594 U.S. at 106. Any "forward-looking" remedy poses a "danger of imposing restrictions that prevent the defendant from forging new routes to serve consumers." *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1223-24 (D.C. Cir. 2004). Judicially mandated "market engineering" frequently produces unintended consequences. *Id.* at 1232 (citation omitted). Antitrust remedies "need to be 'tailored as precisely as possible to the competitive harms,'" thus avoiding "'unnecessary [judicial] entanglements with the competitive process.'" *Saint Alphonsus Med. Ctr. Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 793 (9th Cir. 2015) (quoting U.S. Dep't of Justice, *Antitrust Division Policy Guide to Merger Remedies* § II n. 12 (2011)).

The injunction's requirement that Google aid its competitors warrants special caution. "Forcing firms to help one another" always risks "judicial complicity in collusion and dampened price competition." *Novell*, 731 F.3d at 1073. So courts typically refuse to impose such remedies. For example, *New York v. Microsoft Corp.* refused to impose a "mandatory [computer program] distribution requirement upon Microsoft." 224 F. Supp. 2d 76, 189-90 (D.D.C. 2002), *aff'd*, 373 F.3d 1199 (D.C. Cir. 2004). "[A]n appropriate remedy should open the doors to competition," but "favoritism of one market participant over another in a remedy provision places the Court in the improper position of exerting too much control over the market." *Id.* at 189. As the D.C. Circuit explained, a mandatory distribution requirement would "help

specific competitors but not the process of competition." *Massachusetts v. Microsoft Corp.*, 373 F.3d at 1229. This Court has likewise eschewed mandatory distribution requirements to avoid "free-riding" by competitors. *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1225 (9th Cir. 1997).

This Court should maintain the status quo of a competitive app economy by granting a stay pending appeal. The district court gave Google only eight months to begin distributing rival app stores, sharing its app catalog with any third-party app store, and completing downloads of apps for users of third-party app stores. Inj. at 2-3. And the court gave Google just weeks to comply with provisions altering Google's contractual relationships with hundreds of thousands of third parties. That breakneck timeline means the injunction's competitive harms will take effect before this Court can complete its review. A stay pending appeal would therefore reflect appropriate "caution" by preserving this Court's ability to consider full briefing and argument before the "heavy hand of judicial power" possibly undermines competition in this important technological market. *NCAA*, 594 U.S. at 106.

## CONCLUSION

This Court should stay the district court's injunction pending appeal.

Dated: October 23, 2024          Respectfully submitted.

*/s/ Scott A. Keller*
Scott A. Keller
Steven P. Lehotsky
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW
Washington, DC 20001
(512) 693-8350
scott@lkcfirm.com

Drew F. Waldbeser
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

On October 23, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

*/s/ Scott A. Keller*
Scott A. Keller

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number 24-6256**

I am the attorney or self-represented party.

**This brief contains <u>2,794</u> words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[x] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3), as calculated under Cir. R. 32-3.

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

   [ ] it is a joint brief submitted by separately represented parties;

   [ ] a party or parties are filing a single brief in response to multiple briefs; or

   [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _/s/ Scott A. Keller_      **Date** 10/23/2024

15