**Nos. 24-6256 & 24-6274**

IN THE

# United States Court of Appeals for the Ninth Circuit

EPIC GAMES, INC.,

*Plaintiff-Appellee,*

– v. –

GOOGLE LLC, *et al.*,

*Defendants-Appellants.*

On Appeal From a Final Judgment of the United States District Court for the Northern District of California (Donato, J.), Nos. 3:20-cv-05671 & 3:21-md-02981

**BRIEF OF COMPUTER SECURITY EXPERTS JOHN MITCHELL, SERGE EGELMAN, AND NATHAN GOOD AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLANTS AND THEIR APPLICATION FOR A PARTIAL STAY OF A PERMANENT INJUNCTION PENDING APPEAL**

Robert T. Smith
KATTEN MUCHIN ROSENMAN LLP
1919 Pennsylvania Avenue, N.W.
Suite 800
Washington, D.C. 20006-3404
robert.smith1@katten.com
202-625-3500

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

Table of Authorities..................................................................................ii

Statement of Interest of *Amici Curiae*.................................................... 1

Argument: Paragraph 10 of the District Court's Injunction Order Will Expose More Than One-Hundred Million Users of Google's Play Store to Extensive Security Risks.................... 3

Conclusion ............................................................................................. 10

Certificate of Compliance ...................................................................... 11

Certificate of Service ............................................................................. 12

# TABLE OF AUTHORITIES

Admin. Office of U.S. Courts, *Information Systems and Cybersecurity – Annual Report 2022* ................................................. 9

Bitdefender, *Unveiling Mobile App Secrets: A 6-Month Deep Dive into Surprising Behavior Patterns*, Jan. 8, 2024 ............................. 4

Federal Bureau of Investigation, *On the Internet: Be Cautious When Connected* ............................... 7

Federal Bureau of Investigation, *Spoofing and Phishing* ................................................................. 4

Global Anti-Scam Alliance, *Global State of Scams – 2023* ..................................................... 6-7

Byron Tau, *Apple and Google to Stop X-Mode From Collecting Location Data From Users' Phones*, Wall St. J., Dec. 9, 2020 ......... 5

Haoyu Wang, *et al.*, *Beyond Good Play: A Large-Scale Comparative Study of Chinese Android App Markets*, 2018 Internet Measurement Conference, Association for Computing Machinery (Oct. 31 – Nov. 2, 2018) .............................. 6

## STATEMENT OF INTEREST OF *AMICI CURIAE*[*]

*Amici curiae* are current and former academics who have studied and researched in the areas of computer security and privacy, and who have extensive experience analyzing the security and privacy risks of mobile applications. As such, *amici* have a significant interest in computer security and ensuring that policymakers and courts make informed, rational decisions about privacy and data security.[**]

John Mitchell is the Mary and Gordon Crary Family Professor, professor of computer science, and by courtesy professor of electrical engineering and professor of education at Stanford University. He was previously chair of the Computer Science Department. Professor Mitchell's research focusses on programming languages, computer security and privacy, blockchain, machine learning, and technology for education. With over 250 publications and over 30,000 citations, he has

---

[*] All parties consent to the filing of this brief. No counsel for any party in this case authored this brief in whole or in part. No person or entity—other than *amici curiae* and their counsel—made a monetary contribution specifically for the preparation or submission of this brief.

[**] Although *amici* are affiliated with various academic and business institutions, they lend their support to this brief in only their individual capacities. Nothing in this brief should be construed as the position of the academic institutions and businesses with which they are affiliated.

- 1 -

led research projects on a range of topics, been a consultant or advisor to many companies, and served as editor-in-chief of the Journal of Computer Security.

Serge Egelman is the Research Director of the Usable Security and Privacy group at the International Computer Science Institute, which is an independent research institute affiliated with the University of California, Berkeley. He also holds a position as a research scientist within the Electrical Engineering and Computer Sciences Department at the University of California, Berkeley. He is a co-founder and Chief Scientist of AppCensus, Inc., which builds tools to test the privacy behaviors of mobile applications. He received his Ph.D. from Carnegie Mellon University's School of Computer Science; his research has been cited over 13,000 times; and he has testified before Congress on issues relating to the privacy and security of mobile applications.

Nathan Good is the Principal of Good Research, LLC, the Chief Executive Officer of AppCensus, Inc., and a former lecturer at the School of Information at the University of California, Berkeley. A fundamental goal of his work is to assist companies in creating networked systems devices and services that are simple, secure, and respectful of people's

privacy. Dr. Good received his Ph.D. in Information Science and a M.S. in Computer Science from the University of California, Berkeley. He has published extensively on user-experience studies, privacy, and security-related topics, holds patents on software technology for multimedia systems and event analysis, is a co-author of the UC Berkeley web privacy census, and has testified before the House of Representatives and the Senate on his research on privacy and information security.

## ARGUMENT

### Paragraph 10 of the District Court's Injunction Order Exposes More Than One-Hundred Million Users of Google's Play Store to Extensive Security Risks.

The District Court's injunction exposes more than one-hundred million U.S.-based users of Google's Play Store to extensive security risks. Under that order, Google may not prohibit developers from providing links to download applications outside the Google Play Store. *See* Injunction Order ¶ 10. That provision is a recipe for disaster.

Google currently prohibits developers from including external links to download applications in any application the developer distributes through the Play Store because such links present a serious security risk. Links can direct users to anywhere on the Internet. If those end sites are

- 3 -

malicious but appear legitimate, they could trick users into installing malware on their phones and other Android devices, direct users to provide credit card and other sensitive financial and personal information, steal users' data, track users' activities on the Internet, and even access a device's location, text messages, microphone, and camera, and initiate or answer phone calls. *See* Bitdefender, *Unveiling Mobile App Secrets: A 6-Month Deep Dive into Surprising Behavior Patterns*, Jan. 8, 2024 (describing various types of malware that can operate on an Android device)[1]; *see also* Federal Bureau of Investigation, *Spoofing and Phishing* (describing the process by which cybercriminals can use links to cause users to "download malicious software, send money, or disclose personal, financial, or other sensitive information").[2]

The dangers of the District Court's injunction order are particularly significant because users would encounter these links in a previously trusted environment. Because Google has spent years cultivating a secure user experience within the Play Store and applications available

---

[1] https://www.bitdefender.com/en-us/blog/labs/unveiling-mobile-app-secrets-a-6-month-deep-dive-into-surprising-behavior-patterns/.

[2] https://www.fbi.gov/how-we-can-help-you/scams-and-safety/common-frauds-and-scams/spoofing-and-phishing.

on Play, users will be more prone to trust these links, exposing them to all the risks outlined above. And whereas Google is able to scan and vet the applications that it makes available through the Play Store, mitigating the risk of malware and quickly taking down malicious and unwanted applications through centralized mechanisms, Google cannot possibly track every application available for download on the Internet that would be accessible through the kinds of external links mandated by the District Court. *See, e.g.*, Byron Tau, *Apple and Google to Stop X-Mode From Collecting Location Data From Users' Phones*, Wall St. J., Dec. 9, 2020 (explaining that Google and Apple were successful in removing X-Mode's tracking software from any application present in their app stores).[3] Rather, users would be dependent on running scanning software from their individual devices, which is a useful feature but is reactive, not a prophylactic mechanism at a centralized distribution point. Notably, Google does not force users of Android mobile devices to download applications through Google's Play Store; they are free to download applications from external sources (known as side-loading),

---

[3] https://www.wsj.com/articles/apple-and-google-to-stop-x-mode-from-collecting-location-data-from-users-phones-11607549061.

- 5 -

including from third-party app stores. But for those users who elect to use Google's Play Store, many likely prefer Play's security features. Indeed, academic research suggests that malware has flourished on Android devices whose users have downloaded applications outside of Google Play. *See, e.g.*, Haoyu Wang, *et al.*, *Beyond Good Play: A Large-Scale Comparative Study of Chinese Android App Markets*, 2018 Internet Measurement Conference, Association for Computing Machinery (Oct. 31 – Nov. 2, 2018) (concluding that Chinese app markets perform substantially worse when taking active measures to protect mobile users and legitimate developers from deceptive and abusive actors, showing a significantly higher prevalence of malware and fake and cloned apps than Google Play).[4]

Cybercriminal organizations, state-sponsored actors, and freelancers are already highly successful in tricking people over unsecure forms of communication, including e-mails, text messages, and telephone calls. According to one study, 78 percent of mobile users experienced at least one scam in the last year, and those scams are most often initiated by sending links to get users to install malicious applications. Global

---

[4] https://conferences.sigcomm.org/imc/2018/papers/imc18-final148.pdf.

Anti-Scam Alliance, *Global State of Scams – 2023*, at 12-13.[5] Allowing malicious actors to communicate through applications downloaded on Google's Play Store will only exacerbate these problems, reducing those few regions of the Internet that users can generally trust. *See* Federal Bureau of Investigation, *On the Internet: Be Cautious When Connected* (warning Internet users not to access unverified links that could steer users to spoofed websites).[6]

The dangers of the District Court's order are not difficult to envision. Having impaired Google's ability to fully vet the developers and applications that appear on its Play Store and applications available through Play, the order exacerbates these problems by allowing developers to push seemingly benign links that will take users—likely unwittingly—outside Google's secure environment. Users could be directed to seemingly legitimate sites where they are instructed to provide their financial and personal information—only to learn after it is much too late that they tendered that private information to

---

[5] https://www.scribd.com/document/679758338/Global-State-of-Scams-Report-2023-Global-GASA-final.

[6] https://www.fbi.gov/how-we-can-help-you/scams-and-safety/on-the-internet.

- 7 -

cybercriminals. Children could be taken from a seemingly safe gaming application to websites peddling in sexually explicit materials. And still other users could be directed to follow prompts that, unbeknownst to them, install malware onto their Android devices, exposing them to a range of malicious applications that could share private information with third parties, track their use across other applications, disclose their location and the contents of their text messages, access their phone, camera, and microphone, and destroy the data on their devices.

On top of that, these risks are not limited to an individual user's Android device; they could expose business and governmental networks to illicit attacks. Among other things, cybercriminals could gain access to passwords and other sensitive information that Android users also use to access their work accounts. That, in turn, could expose State secrets and third-party intellectual property to theft or destruction. Likely for these reasons, the Administrative Office of the U.S. Courts recognizes the "threat" posed to its networks by court personnel accessing "malicious

- 8 -

websites." Admin. Office of U.S. Courts, *Information Systems and Cybersecurity – Annual Report 2022*.[7]

The District Court's order compounds these problems by demanding that Google allow developers to provide links in a matter of weeks. In *amici*'s experience, it would take many months, if not a year or more, to build out programming code to help mitigate some of the risks posed by the District Court's order on the scale necessary for Google's Play Store. Thus, whatever measures Google might take to alleviate some of the security risks that are inherent in the District Court's ill-conceived order, Google is deprived of the time necessary to do so.

To be clear, it would be impossible for Google to build out programming that mitigates fully the risks posed by the District Court's order. No company, not even Google, would have the resources to vet every region of the Internet, which is precisely what the District Court's order would demand to block malicious links from being communicated to users of Google's Play Store and applications available on Play. As a result, although additional time would allow Google to mitigate some of

---

[7] https://www.uscourts.gov/statistics-reports/information-systems-and-cybersecurity-annual-report-2022.

- 9 -

the risks posed by the District Court's order, the better course would be to stay the injunction in its entirety pending appeal—except for paragraph 8 of the order, which *amici* understand was a provision negotiated between Google and the States as part of a settlement.

## CONCLUSION

The Court should stay the order enjoining Google pending appeal—except for paragraph 8 of that order. A contrary holding would expose more than one-hundred million U.S.-based users of Google's Play Store to extensive security, privacy, and safety risks.

Dated:  October 23, 2024                    Respectfully submitted,


/s/ Robert T. Smith
Robert T. Smith
Katten Muchin Rosenman LLP
1919 Pennsylvania Avenue, N.W.
Suite 800
Washington, D.C. 20006-3404
robert.smith1@katten.com
202-625-3500

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g)(1) of the Federal Rules of Appellate Procedure, I hereby certify that this brief is in compliance with the type-form and volume requirements. Specifically, the Brief of *Amici Curiae* is proportionately spaced; uses a Roman-style, serif typeface (Century Schoolbook) of 14-point; and contains 1,730 words, exclusive of the material not counted under Rule 32(f) of the Federal Rules of Appellate Procedure.

/s/ Robert T. Smith
Robert T. Smith
*Counsel for Amici Curiae*

- 11 -

## CERTIFICATE OF SERVICE

I hereby certify that on October 23, 2022, I electronically transmitted a copy of the foregoing Brief of *Amici Curiae* to the Clerk of the Court using the Appellate Case Management System (ACMS) for filing. Service will be accomplished electronically through the ACMS for all registered participants.

/s/ Robert T. Smith
Robert T. Smith
*Counsel for Amici Curiae*
