Nos. 24-6256 & 24-6274

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

EPIC GAMES, INC.,
*Plaintiff-Appellee,*

*v.*

GOOGLE LLC, *ET AL.,*
*Defendants-Appellants.*

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA DISTRICT COURT NO. 3:20-CV-05671-JD*

## BRIEF OF *AMICUS CURIAE* CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA IN SUPPORT OF DEFENDANTS-APPELLANTS

TYLER S. BADGLEY
MARIA C. MONAGHAN
Chamber of Commerce of the
United States of America
615 H Street, N.W.
Washington, D.C. 20062

JEAN-CLAUDE ANDRE
Bryan Cave Leighton Paisner LLP
120 Broadway, Suite 300
Santa Monica, CA 90401
jc.andre@bclplaw.com
Tel. (310) 576-2148

BARBARA A. SMITH
SETH M. REID
Bryan Cave Leighton Paisner LLP
211 North Broadway, Suite 3600
St. Louis, MO 63102

ERIC P. SCHROEDER
SLADE MENDENHALL
Bryan Cave Leighton Paisner LLP
1201 W. Peachtree St., N.W., 14th Fl.
Atlanta, GA 30309

DAVID B. SCHWARTZ
Bryan Cave Leighton Paisner LLP
1155 F Street NW, Suite 700
Washington, DC 20004

Attorneys for CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *Amicus Curiae* the Chamber of Commerce of the United States of America states that it is a non-profit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

DATED: December 4, 2024          Respectfully submitted,

Bryan Cave Leighton Paisner LLP

*/s/ Jean-Claude André*

JEAN-CLAUDE ANDRE
Attorneys for CHAMBER OF
COMMERCE OF THE UNITED STATES
OF AMERICA

i

# TABLE OF CONTENTS

**DESCRIPTION**                                                           **PAGE**

CORPORATE DISCLOSURE STATEMENT ............................................i

INTEREST OF *AMICUS CURIAE* ................................................ 1

INTRODUCTION .................................................................3

ARGUMENT .................................................................... 6

     A.    Courts Should Craft Equitable Antitrust Relief Cautiously, Narrowly Tailoring Relief to Only Established Harms ................................................. 6

          1.    Antitrust Remedies Require Careful Constraint to Remedy Harm Without Intruding on Lawful Competition ................................................. 6

          2.    Narrowly Tailored Remedies Are Pro-Competitive and Foster Economic Growth ........................................ 8

     B.    The District Court's Injunction Is Not Narrowly Tailored to the Established Harms in Three Ways.............. 10

          1.    Certain of the District Court's Requirements Are Not Narrowly Tailored to the Alleged Anticompetitive Conduct ............................................. 11

          2.    The District Court's Forced-Sharing Requirement Ignores the Downstream Consequences in this Two-Sided Network ....................................... 13

          3.    The Forced-Carrying Provision's Imposition of a "Reasonable Price" Based on "Actual Costs" Is Beset with Measurement Problems............................ 19

     CONCLUSION .................................................................24

# TABLE OF AUTHORITIES

**DESCRIPTION**                                                    **PAGE(S)**

## Cases

*Carpenter v. United States*,
    585 U.S. 296 (2018) ................................................................. 18

*Cnty. of Tuolumne v. Sonora Cmty. Hosp.*,
    236 F.3d 1148 (9th Cir. 2001) ................................................... 7

*Cont'l T.V., Inc. v. GTE Sylvania Inc.*,
    433 U.S. 36 (1977) ................................................................... 19

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023)................................................ 6, 22, 23

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ............................................ 6, 18, 21

*In re Innovatio IP Ventures, LLC Pat. Litig.*,
    2013 WL 5593609 (N.D. Ill. Oct. 3, 2013)..................................20

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ................................................................... 9

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009)...........................................20, 22

*Massachusetts v. Microsoft Corp.*,
    373 F.3d 1199 (D.C. Cir. 2004)............................................ 8, 9, 13

*Nat'l Elec. Contractors Ass'n v. Nat'l Constructors Ass'n*,
    678 F.2d 492 (4th Cir. 1982) ...................................................... 8

*NCAA v. Alston*,
    594 U.S. 69 (2021) ........................................................... 3, 7, 9, 10

*New York Times Co. v. Tasini*,
    533 U.S. 483 (2001) ................................................................. 16

iii

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                      **PAGE(S)**

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018) .................................................................... 15, 19

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
    20 F.4th 466 (9th Cir. 2021) ............................................................ 12

*Town of Concord v. Bos. Edison Co.*,
    915 F.2d 17 (1st Cir. 1990) .............................................................. 21

*United States v. Addyston Pipe & Steel Co.*,
    85 F. 271 (6th Cir. 1898), *aff'd as modified*,
    175 U.S. 211 (1899) .................................................................... 4, 10

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ......................................... 8, 12, 13, 19

*United States v. Syufy Enters.*,
    903 F.2d 659 (9th Cir. 1990) ........................................................... 10

*Verizon Commc'ns, Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ............................................................. 9, 14, 20

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
    395 U.S. 100 (1969) ..................................................................... 6, 7

**Statutes**

15 U.S.C. § 26 ........................................................................................ 6

**Other Authorities**

Phillip Areeda & Herbert Hovenkamp, ANTITRUST LAW:
    AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR
    APPLICATION............................................................. 3, 10, 14, 15, 21

iv

Nos. 24-6256 & 24-6274

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

EPIC GAMES, INC., a Maryland Corporation,

*Plaintiff-Appellee,*

*v.*

GOOGLE LLC, *ET AL.*,

*Defendants-Appellants.*

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA DISTRICT COURT NO. 3:20-CV-05671-JD*

## BRIEF OF *AMICUS CURIAE* CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA IN SUPPORT OF DEFENDANTS-APPELLANTS

### INTEREST OF *AMICUS CURIAE*[1]

The Chamber of Commerce of the United States of America (the Chamber) is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), *amicus curiae* states that no counsel for any party authored this brief in whole or in part and no entity or person, aside from amicus curiae, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files amicus curiae briefs in cases, like this one, that raise issues of concern to the nation's business community.

The Chamber and its members have a strong interest in this appeal for at least two reasons. First, in the antitrust context generally, the Chamber's members rely on carefully crafted injunctions that do no more than necessary to remedy an actually proven antitrust harm. While antitrust laws exist to preserve vibrant competition—an important value at the heart of America's economic success and continued growth—those laws also need to be applied with a scalpel, not a sledgehammer, in order to ensure they serve their important function without unduly punishing pro-competitive behavior and economic growth. Second, the district court's injunction here threatens to create unacknowledged negative downstream effects. As explained below, the challenged provisions will entangle the district court and millions of app developers in ongoing

2

disputes that are all but guaranteed to be unjust, slow, and costly. The Chamber's members have a strong interest in the quick and fair resolution of this dispute, so that Google's alleged restraints can be lifted and competition in the relevant markets can resume.

## INTRODUCTION

The Supreme Court has instructed district courts that, when it comes to fashioning an antitrust remedy, "caution is key." *NCAA v. Alston*, 594 U.S. 69, 106 (2021). An antitrust remedy untethered to the specific violations found by the district court risks creating unintended consequences on both courts and third parties. That is especially true with rarely used remedies that impose a duty to deal. Such forced-dealing remedies are, in the words of the leading treatise, the "[m]ost difficult of all." Phillip Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 653b2.

These concerns are at their apex given the complex, ongoing two-sided network setting of this case. Google's Play platform connects, on one side, one million app developers of all sizes and sophistication, collectively producing over 3.3 million apps in Google's library for the benefit of, on the other side, hundreds of millions of individual users.

3

These relationships are not one-offs. To the contrary, those who interact with Google's Play platform (Google Play itself, app developers, and app users) usually maintain an ongoing relationship via, for example, updates and technical fixes, extended use of the app over time, ongoing subscription payments, and other interactions.

While parts of the district court's injunction are routine, two provisions require particularly close examination. One provision imposes a forced-sharing requirement on Google, mandating that Google provide unfettered access to its catalog of Google Play apps for any other app store. A second provision imposes a forced-carrying requirement on Google, requiring Google Play to carry third parties' app stores at court-imposed "reasonable fees."

These portions of the injunction led the district court into the "sea of doubt" that over 125 years of case law warn against. *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 284 (6th Cir. 1898) (Taft, J.), *aff'd as modified,* 175 U.S. 211 (1899). Neither the parties in their stay briefing nor the district court cited any analogous case in which such provisions have been applied in a two-sided platform setting. Yet the problems from these provisions are as plentiful as they are obvious.

4

*First*, these provisions are not narrowly tailored to the harm Epic complained of, and which the district court addressed in the first ten paragraphs of its injunction.

*Second*, the forced-sharing provision will harm app developers and app users, expropriating developers' intellectual property while exposing users' most sensitive data to all comers.

*Third*, the forced-carrying provision requiring Google Play to charge "reasonable fees" to cover its "actual costs" will embroil the district court in time-consuming, arduous disputes. As decades of case law have explained, such terms inexorably lead a district court to engage in regulatory rate-setting that is beyond the judicial function.

The Chamber recognizes the importance of antitrust remedies in protecting competition.[2] But when imposing the most difficult of all antitrust remedies, a court must account for the settings in which those remedies will operate. The district court here failed to do so. This Court should therefore vacate, at minimum, these two provisions of the district court's injunction.

---

[2]    The Chamber takes no position on Google's arguments regarding liability.

5

## ARGUMENT

### A. Courts Should Craft Equitable Antitrust Relief Cautiously, Narrowly Tailoring Relief to Only Established Harms

Longstanding principles of judicial restraint require courts to exercise caution when crafting injunctions. Both the Supreme Court and this Court have instructed district courts to limit injunctive relief so that it is only as broad as necessary to remedy the established harm. Antitrust cases require district courts to carefully consider the scope and purpose of any remedy employed to ensure that it furthers the important goals of antitrust law—fostering competition and protecting consumers—while also ensuring a vibrant and pro-competitive marketplace.

#### 1. Antitrust Remedies Require Careful Constraint to Remedy Harm Without Intruding on Lawful Competition

Section 16 of the Clayton Act, 15 U.S.C. § 26, authorizes injunctive relief that is appropriate under "traditional principles of equity." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 130 (1969). Thus, "injunctive relief must be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1002 (9th Cir. 2023) (cleaned up); *see Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1225 (9th Cir.

6

1997) ("If future harm may be prevented without eroding the value of [the defendant's property rights], less restrictive means need be pursued.").[3] In "fashioning an antitrust remedy," moreover, district courts must "resist the temptation to require that enterprises employ the least restrictive means of achieving their legitimate business objectives." *NCAA v. Alston*, 594 U.S. 69, 106 (2021).

Antitrust injunctions must narrowly target the harm proven in a given case. In particular, an antitrust remedy must be fashioned to "restrain acts which *are of the same type or class*" as the unlawful acts that have been committed or may "fairly be anticipated." *Zenith Radio Corp.*, 395 U.S. at 132 (emphasis added) (citation omitted). That is because a court is not at liberty to enjoin "all future violations of the antitrust laws, however unrelated to violations found by the court." *Id.* at 132–33.

---

[3]    The equitable principles guiding injunctions under the Sherman Act and California's Unfair Competition Law are materially identical. *See Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001). The parties, moreover, have treated these sources of law coterminously in this litigation. *See* 1-ER-12 n.4 (district court injunction opinion).

7

Furthermore, a court "must base its relief on some clear indication of a significant causal connection between the conduct enjoined or mandated and the violation found directed toward the remedial goal intended." *United States v. Microsoft Corp.*, 253 F.3d 34, 105 (D.C. Cir. 2001) (en banc) (per curiam) (cleaned up); *see, e.g., Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1210 (D.C. Cir. 2004) (praising the district court for fashioning a limited remedy that "went to the heart of the problem . . . without intruding itself" into the defendant's business); *Nat'l Elec. Contractors Ass'n v. Nat'l Constructors Ass'n,* 678 F.2d 492, 502 (4th Cir. 1982) (praising the district court for "do[ing] no more than enjoin the enforcement of, and collection of money under, a contract held to violate the antitrust laws").

## 2.    Narrowly Tailored Remedies Are Pro-Competitive and Foster Economic Growth

Equitable antitrust remedies can promote consumer welfare by protecting the free market. But an antitrust case "cannot be used as a vehicle by which to fight every potential future violation of the antitrust laws . . . envisioned by [the defendant's] competitors." *Massachusetts*, 373 F.3d at 1218 n.9 (internal quotation marks and citation omitted). That is particularly so here, where the injunction against Google contains more-

8

tailored provisions that already address the relevant anticompetitive conduct. *E.g.*, 1-ER-4 ¶ 8. Given these existing provisions, the district court "should [have] be[een] particularly disinclined to require more" in "adopting . . . forward-looking provision[s] addressing conduct not previously held to be anticompetitive." *Massachusetts*, 373 F.3d at 1218. But the district court did not do so here.

Courts face a delicate balance between remedying bad conduct and not tamping down competitive behavior. "[E]ven under the best of circumstances, applying the antitrust laws can be difficult." *Alston*, 594 U.S. at 99 (cleaned up); *see also Verizon Commc'ns, Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 414 (2004) (weighing the "slight benefits of antitrust intervention" against a "realistic assessment of its costs"); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 895 (2007) (explaining that a proposed legal rule could "increase the total cost of the antitrust system by prohibiting procompetitive conduct the antitrust laws should encourage"). Indeed, since the time of then-Judge Taft, courts have been "wary" about interposing their judgment over complex business relationships, lest they "'set sail on a sea of doubt.'"

9

*Alston*, 594 U.S. at 107 (quoting *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 284 (6th Cir. 1898), *aff'd as modified,* 175 U.S. 211 (1899)).

The danger posed by overbroad antitrust rulings presents special harms at the remedy stage. The further a remedy departs from repairing the established harm, the greater the risk that the equitable "relief" will prevent natural free market efficiencies from flowing. In particular, a court fashioning an antitrust remedy must always remember that "competition, not government intervention, is the touchstone of a healthy, vigorous economy." *United States v. Syufy Enters.*, 903 F.2d 659, 663–64 (9th Cir. 1990). The caution that a court must display in issuing an antitrust remedy requires that court to consider the specific and potentially novel business context that its injunction targets, as well as any downstream effects from that injunction. *See* Areeda & Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 653j ("[A]ny equitable decree must be attentive to the state of competition that results from the decree.").

## B.    The District Court's Injunction Is Not Narrowly Tailored to the Established Harms in Three Ways

The district court flouted the above principles in issuing an injunction with two insufficiently justified components: a forced-sharing

requirement for all of the apps in Google's Play store (1-ER-4–5 ¶ 11) and a forced-carrying requirement for other app stores on Google's Play store at court-imposed "reasonable" fees (1-ER-5 ¶ 12). Both provisions go far beyond the conduct that Epic initially complained about—which was always about fees charged for in-app transactions—or argued at trial. Moreover, each paragraph has its own fatal flaws. The forced-sharing requirement will produce significant downstream consequences that the district court apparently did not consider, much less justify. And the forced-carrying requirement is inadministrable, inevitably creating disputes that are time-consuming, outside a court's competence, and beyond the relief necessary to address the core of Epic's claims.

1. ***Certain of the District Court's Requirements Are Not Narrowly Tailored to the Alleged Anticompetitive Conduct***

Initially, these requirements go far beyond the conduct that Epic complained about and that the district court addressed in other parts of its order. In the operative complaint, Epic complained that Google imposed revenue-sharing and licensing restrictions on original equipment manufacturers (OEMs), prohibitions on app developers from offering apps elsewhere or creating their own app stores, and

11

requirements for app developers to use Google's in-app payment processing solution. *See* Dkt. 82 at ¶¶ 18-26.[4] In other words, Epic wanted to access the Android operating system without having to pay Google.

In its injunction, the district court granted Epic the very relief that Epic sought. Google can no longer condition revenue-sharing with OEMs (1-ER-4 ¶ 8), can no longer condition revenue-sharing with app developers (1-ER-3–4 ¶¶ 4-7), and can no longer tie its in-app payment processing solution to the use of Google Play (1-ER-4 ¶ 9). While the parties dispute whether these remedies are properly tailored, the district court failed to consider the impact of these remedies in assessing whether there was "'a significant causal connection between the conduct enjoined or mandated and the violation found directed toward the remedial goal intended'" before imposing further remedies. *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 486 (9th Cir. 2021) (quoting *Microsoft Corp.*, 253 F.3d at 105).

The district court went astray in going beyond the relief necessary to address the core of Epic's complaint. The district court acknowledged

---

[4]     All documents are from N.D. Cal. No. 3:21-md-02981-JD unless otherwise specified.

significant evidence of harms caused by various Google agreements "conditioning . . . access by OEMs to Google's Android services on preinstallation of the Google Play Store." 1-ER-19. But the district court never explained why the other parts of its injunction specifically targeted at ending those agreements would be insufficient to resolve Epic's complaints. *See* 1-ER-19. To be sure, the district court was concerned about network effects (1-ER-17–18), but it never explained why Epic required the additional remedies beyond the ones narrowly tailored to the harms Epic experienced. This "fail[ure] to provide an adequate explanation for the relief it ordered" is an independent basis to vacate these requirements. *Microsoft Corp.*, 253 F.3d at 103. And they both fail to heed the well-established caution against courts "adopting a forward-looking provision addressing conduct not previously held to be anticompetitive." *Massachusetts*, 373 F.3d at 1218.

### 2. *The District Court's Forced-Sharing Requirement Ignores the Downstream Consequences in this Two-Sided Network*

The district court imposed the forced-sharing provision without accounting for the unique nature of this two-sided network. Specifically, a court must always consider how its injunction will affect the relevant

market so that the court can anticipate and account for downstream consequences. *See, e.g.*, *Trinko*, 540 U.S. at 414 (weighing the "slight benefits of antitrust intervention" against a "realistic assessment of its costs"). That analysis never occurred in this case because the district court never considered information from app users or any app developer besides Epic. And that failure is particularly harmful here, where the court issued a mandatory regulatory injunction that compelled Google to undertake sweeping and materially new conduct to deal with millions of other market participants. *See* Areeda & Hovenkamp, *supra* ¶ 653b2 ("Most difficult of all are remedies that force defendants to deal with others. Invariably the court must then impose the terms of dealing and perhaps retain ongoing jurisdiction to regulate the price and terms of future sales.").

There is no indication that the court grappled with the many deleterious downstream consequences its order would cause in the markets it sought to regulate. Nor did the court explain its refusal to limit its injunction to the prohibitory provisions in paragraphs 1-10 of its order, which, by contrast, would not have presented the same risks: "[T]here is no unfairness or disincentive to meritorious competition in

14

simply preventing the conduct at the outset or ordering the monopolist to stop." Areeda & Hovenkamp, *supra*, ¶ 653b.

The downstream consequences here flow from the two-sided network. There is no dispute that the Google Play platform is a two-sided network that matches app developers and app users who both continue to rely on the network to facilitate their ongoing relationship. *See* 1-ER-16 (reciting the court's jury instruction that Google Play is a "'two-sided platform market' that 'offers products or services to two different groups who both depend on the platform to intermediate between them'"); *see also Ohio v. Am. Express Co.*, 585 U.S. 529, 544–47 (2018) (explaining the sensitive interlocking effects of a two-sided transaction network). This novel context involves multiple ongoing relationship between diverse groups of affected parties—the platform operator (Google), app developers, and app users—and required the district court to carefully consider how its injunction would affect the various stakeholders' commercial relationships.

The district court's order showed no understanding of the simple fact that apps are not widgets. Google Play does not sell discrete products or engage in one-off transactions, but rather facilitates ongoing

15

relationships between app developers and users. The district court's order therefore demands forced-sharing not just with one company, but with *thousands* of developers and *millions* of users. This will cause harm to parties on both sides of the network. Some app developers may not want users to have that kind of unfettered, immediate access, whether because of scale issues (*e.g.*, not enough server space on the developer's end), channel management, reputation management, or separate exclusivity agreements, among other concerns. The forced-sharing remedy also likely harms app developers by additionally forcing them to publish their intellectual property in multiple channels without the developers' consent, in violation of Google's licensing agreements with those developers. 3-ER-624–25; *cf. New York Times Co. v. Tasini*, 533 U.S. 483, 488 (2001) (authors maintained copyrights in digital works that were not covered by earlier licensing agreement). To be sure, a single sentence of the injunction requires Google to develop some kind of opt-out mechanism for developers who do not want their app hosted on another app store. 1-ER-5 ¶ 11. But this mechanism is more likely to cause confusion than clarity. The court gave no specific requirements for how or when this opt-out mechanism would work.

16

Moreover, even Epic's own expert agreed that "there tend to be very strong default effects, the default effect being whatever you establish as the default, you get a lot of people just not changing the default." 3-ER-479. In such a setting, Google's expert pointed out that "there are going to be a very large number of developers that are opted in without realizing that, without paying attention to it, without noticing this notification that might come through their e-mail." 3-ER-482. The sweeping scale of the proposed remedy further increases the risk: as the district court itself explained, an app developer will need to repeatedly make use of this ill-defined opt-out by third-party app stores, many of which will be added over time. 3-ER-481–82; 3-ER-485. Yet the district court never explained how the opt-out will protect against hundreds of thousands of developers being repeatedly forced onto other app stores unless the non-party continuously monitor the entire app ecosystem.

The ramifications are even more concerning on the app user side. The district court's forced-sharing requirement has no criteria for what counts as a "third-party Android app store[]." *See* 1-ER-4 ¶ 11. Thus, Google has no discretion to determine whether an app store is a bona fide third-party, a fraudulent designer trolling for user data, or an agent of a

17

foreign power. 3-ER-626–27. If the district court's forced-sharing requirement comes into force, it will provide innumerable and unregulated "app stores" unfettered access to highly sensitive ongoing information about app users, such as health information, private communications, and political affiliations, among other categories of personal data. 3-ER-626–27; *cf. Carpenter v. United States*, 585 U.S. 296, 311 (2018) (data generated by a smart phone "provides an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations" (internal quotation marks omitted)). Yet the district court addressed none of these downstream consequences in its decision. 1-ER-17–18.

Nor did the court ever address Google's concern that the court's forced-sharing requirement risks harming competition itself. As Google explained, "[e]liminating rivals' need to compete with Play for distribution," "'unnecessarily entrench[es]' Play as the primary source of distribution even for third-party app stores." 3-ER-634 (quoting *Image Tech. Servs.*, 125 F.3d at 1225–26). That is because the forced-sharing remedy will encourage other app stores to free-ride on Google's app

18

catalog rather than compete to develop their own offerings. 3-ER-630–31; *cf. Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 55 (1977) (discussing how the "'free rider' effect" reduces overall output in areas such as service and repair). Indeed, the interdependent nature of two-sided networks, *see Am. Express Co.*, 585 U.S. at 544–47, elevates this risk to its apex, as app developers and users will naturally gravitate toward the cheapest source of pre-written apps, *see Microsoft Corp.*, 253 F.3d at 55.

The district court needed to pay close attention to the economic relationships it sought to regulate—relationships that have not before been regulated by court decree. By failing to attend to these market realities, the court prescribed a cure that is untethered to the supposed disease.

### 3. *The Forced-Carrying Provision's Imposition of a "Reasonable Price" Based on "Actual Costs" Is Beset with Measurement Problems*

The district court next contravened decades of antitrust law by creating a forced-carrying regime that requires app developers and app store owners "to pay a reasonable fee [to Google] . . . based on Google's actual costs." 1-ER-5 ¶12. As a result, the district court is likely to become

19

embroiled in exceedingly complex analyses and arguments over how those terms are calculated, creating a morass of enforceability problems.

The Supreme Court has long warned against forced sharing at court-set prices: "No court should impose a duty to deal that it cannot explain or adequately and reasonably supervise" and in so doing, force a court to "assume the day-to-day controls characteristic of a regulatory agency." *Trinko*, 540 U.S. at 415 (cleaned up). It is even worse when courts, as the district court did here, take it upon themselves to "act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited." *Id.* at 408.

Experience shows that determining a company's actual costs is a lengthy, challenging task to perform with any accuracy. Such efforts often become an exercise in resolving hypotheticals and the application of double-digit, multi-factor tests in order to attempt to consider all relevant variables, "'recreate the *ex ante* . . . negotiation scenario,'" and "'describe the [market participants'] resulting agreement.'" *In re Innovatio IP Ventures, LLC Pat. Litig.*, No. 11 C 9308, 2013 WL 5593609, at *5 (N.D. Ill. Oct. 3, 2013) (quoting *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009)). Courts accordingly abstain from

engaging in price- and rate-setting, "generally consider[ing]" that to be "beyond [their] function." *Image Tech. Servs.*, 125 F.3d at 1225. And they opt for "less restrictive means" wherever possible, seeing price-setting injunctions as posing a considerable risk of disrupting markets and reducing innovation. *Id.* As then-Judge Breyer explained, this is an arduous, time-consuming task:

> [H]ow is a judge or jury to determine a "fair price?" Is it the price charged by other suppliers of the primary product? None exist. Is it the price that competition "would have set" were the primary level not monopolized? How can the court determine this price without examining costs and demands, indeed without acting like a rate-setting regulatory agency, the rate-setting proceedings of which often last for several years?

*Town of Concord v. Bos. Edison Co.*, 915 F.2d 17, 25 (1st Cir. 1990). Accordingly, such orders should be applied to as narrow a range of sales as possible. *See* Areeda & Hovenkamp, *supra*, ¶ 765c ("The court might simply specify that sales must occur at 'reasonable' prices, but reasonableness is not self-defining, and such an order will almost certainly invite further dispute and the court's continuing jurisdiction.").

The district court's injunction violates these principles. It includes a provision that goes beyond the relief necessary to address Epic's claims

about fees for in-app purchases and will result in recurring and costly litigation that the court has shown no willingness or ability to resolve.

Indeed, the court refused to resolve actual-cost disputes before issuing the injunction. For example, before the district court entered its injunction, Epic and Google dramatically differed on what it would cost Google to implement the requirement to distribute other app stores in the Play store. *Compare* 9-ER-2050 (Google estimating costs between $31.4 million and $66.7 million) *with* Dkt. 985 at 29 (Epic estimating that Google's costs would be less than $100,000). Nor does the district court's order address whether Google will have to set a flat fee for every app developer, or whether the reasonable fee will vary based on, *e.g.*, the app developer's ability to pay. *See Lucent Techs.*, 580 F.3d at 1324 (to determine a reasonable rate in comparable contexts, a court must ascertain the developer's "projections of profit"). Simply put, the district court's "reasonable fee" requirement merely delays a grueling battle over what that term means, potentially on a per-developer basis.

Even if the district court were well-positioned to resolve these disputes, it could not do so quickly. In *Epic Games, Inc. v. Apple, Inc.*, this Court determined that Epic failed to prove its antitrust claims but held

22

that the failure of those claims did not foreclose claims under California's Unfair Competition Law (UCL). 67 F.4th at 1001. On remand, the case has produced months of additional discovery, led to numerous disputes for the district court to resolve, and required several hearings.[5] The challenges in this case will only be amplified by the court's injection of the "reasonable fee" and "actual cost" variables.

---

[5]     *See generally* Order Setting Evidentiary Hearing, *Epic Games, Inc. v. Apple, Inc.*, No. 4:20-cv-05640-YGR (N.D. Cal. Apr. 23, 2024) (Dkt. 925) (discussing need for evidentiary hearing on Apple's purported non-compliance with UCL injunction); Joint Status Report, *Epic Games, Inc. v. Apple, Inc.*, No. 4:20-cv-05640-YGR (N.D. Cal. Oct. 28, 204) (Dkt. 1040) (joint status report explaining that after evidentiary hearing, parties produced an additional 95,000 documents, entered into multiple ongoing discovery disputes, and have yet to resolve disputes that required the evidentiary hearing).

23

**CONCLUSION**

For the reasons above, this Court should reverse the district court's injunction order and vacate paragraphs 11-12 of that order. The Chamber takes no position on the other issues in this appeal.

DATED: December 4, 2024          Respectfully submitted,

                                 Bryan Cave Leighton Paisner LLP

                                      */s/ Jean-Claude André*

                                 JEAN-CLAUDE ANDRE
                                 Attorneys for CHAMBER OF
                                 COMMERCE OF THE UNITED STATES
                                 OF AMERICA

24

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, counsel is aware of no related cases pending before this Court.

DATED: December 4, 2024              BRYAN CAVE LEIGHTON PAISNER LLP

                                     */s/ Jean-Claude André*

                                     JEAN-CLAUDE ANDRÉ
                                     Attorneys for CHAMBER OF
                                     COMMERCE OF THE UNITED STATES
                                     OF AMERICA

## CERTIFICATE OF COMPLIANCE

I certify that:

1.     This brief complies with the length limits permitted by Fed. R. App. P. 29(a)(5) and Ninth Circuit Rule 32-1(a)because the brief contains 4,413 words, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016.

DATED: December 4, 2024          BRYAN CAVE LEIGHTON PAISNER LLP

                                                  */s/ Jean-Claude André*

                                                  JEAN-CLAUDE ANDRÉ
                                                  Attorneys for CHAMBER OF
                                                  COMMERCE OF THE UNITED STATES
                                                  OF AMERICA