Nos. 24-6256 & 24-6274

IN THE

# United States Court of Appeals for the Ninth Circuit

EPIC GAMES, INC.,

*Plaintiff-Appellee,*

v.

GOOGLE LLC, *et al.,*

*Defendants-Appellants.*

Appeal from the U.S. District Court
for the Northern District of California
Nos. 3:20-cv-05671-JD, 3:21-md-02981-JD
Hon. James Donato

## ANSWERING BRIEF OF APPELLEE EPIC GAMES, INC.

Gary A. Bornstein
Antony L. Ryan
Yonatan Even
Lauren A. Moskowitz
Justin C. Clarke
Michael J. Zaken
M. Brent Byars
CRAVATH, SWAINE & MOORE LLP
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

Paul J. Riehle
FAEGRE DRINKER BIDDLE & REATH
LLP
Four Embarcadero Center
San Francisco, CA 94111-4180
(415) 591-7500

*Counsel for Plaintiff-Appellee Epic Games, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Epic Games, Inc. ("Epic") states that it has no parent corporation and that Tencent Holdings Limited indirectly owns more than 10% of Epic's stock through wholly owned subsidiaries.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................1

STATUTORY AND REGULATORY PROVISIONS ...................................5

JURISDICTIONAL STATEMENT ...........................................................5

STATEMENT OF ISSUES FOR REVIEW.................................................6

STATEMENT OF THE CASE ..................................................................7

I.  Overview of the Android Ecosystem .........................................7

II.  Epic and Its Case Against Google................................................9

III.  Google's Obstruction of Competition for Distribution of Android Apps. .......................................................................... 11

    A.  The Conduct.................................................................. 11

    B.  The Market for Android App Distribution. ................... 17

IV.  Google's Anticompetitive Conduct Regarding Android In-App Billing Solutions......................................................... 19

V.  Google's Proposed Business Justifications Were Pretextual... 20

VI.  Google's Intentional Destruction of Relevant Evidence. ........ 21

VII.  Relevant Procedural History .................................................... 23

    A.  Google's Motion in Limine ........................................... 23

    B.  Google's Last-Minute Effort to Avoid a Jury .............. 24

VIII.  The Court Entered a Remedy Based on the Jury Verdict. ....... 25

    A.  Remedies Proceedings ................................................... 25

    B.  The District Court's Injunction..................................... 26

SUMMARY OF ARGUMENT ................................................................ 27

ARGUMENT ....................................................................................... 31

I.  Google's Challenges to the Liability Verdict Should Be Rejected. .................................................................................. 31

A.     Issue Preclusion Did Not Bar the Jury's Market Definition Findings. ....................................................... 31

B.     The District Court Properly Rejected Google's Proposed "Single-Brand Aftermarket" Instruction. ...................... 44

C.     The Jury Instructions Did Not Improperly Preclude Google from Relying on Pro-Competitive Justifications in Other Markets. ........................................................... 52

D.     The District Court Properly Conducted a Jury Trial. .... 60

E.     Google Erroneously Argues that the UCL Claim Follows the Antitrust Verdict. ..................................................... 67

II.     The District Court Did Not Abuse Its Discretion in Crafting the Injunction. ................................................................................. 68

A.     The District Court Was Within Its Discretion to Adopt the Catalog-Access and Store-Distribution Remedies. . 69

B.     The Injunction Does Not Engage in Prohibited "Price Regulation" .................................................................. 79

C.     The Injunction Is Not Excessively Vague, and the District Court Did Not Abuse Its Discretion in Appointing a Technical Committee to Address Issues that Arise. ............................................................................ 81

D.     Google's Objection to the Absence of Additional Findings Is Meritless....................................................... 85

III.     Google's Meritless "Standing" Arguments Are Not Jurisdictional, Are Waived and Fail on the Merits. ................. 92

A.     Google's Objections Are Not Jurisdictional and Are Therefore Waived. ......................................................... 93

B.     Google's Objections Are Also Meritless....................... 95

CONCLUSION .............................................................................. 99

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&M Recs., Inc. v. Napster, Inc.*,
284 F.3d 1091 (9th Cir. 2002) .............................................................. 84

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016) .............................................................. 71

*Amadeo v. Principal Mut. Life Ins. Co.*,
290 F.3d 1152 (9th Cir. 2002) .............................................................. 32

*Ass'n of Mexican-Am. Educators v. California*,
231 F.3d 572 (9th Cir. 2000) (en banc) ................................................ 84

*Balser v. Dep't of Justice, Off. of U.S. Tr.*,
327 F.3d 903 (9th Cir. 2003) ................................................................ 32

*Beacon Theatres, Inc. v. Westover*,
359 U.S. 500 (1959)...................................................................... 66, 67

*BladeRoom Grp. Ltd. v. Emerson Elec. Co.*,
20 F.4th 1231 (9th Cir. 2021) ..................................................... 51, 53, 54

*Blonder-Tongue Lab'ys., Inc. v. Univ. of Ill. Found.*,
402 U.S. 313 (1971)............................................................................ 35

*Bresgal v. Brock*,
843 F.2d 1163 (9th Cir. 1987) .............................................................. 97

*Broadnax v. City of New Haven*,
415 F.3d 265 (2d Cir. 2005) ................................................................ 61

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)...................................................................... 40, 41

*Callahan v. PeopleConnect, Inc.*,
No. 20-cv-09203-EMC, 2022 WL 213291 (N.D. Cal. June 14,
2022) .................................................................................................. 36

i

*Carrillo v. Schneider Logistics, Inc.*,
  501 F. App'x 713 (9th Cir. 2012) ............................................................. 84

*Chavez v. Dir., OWCP*,
  961 F.2d 1409 (9th Cir. 1992) ........................................................ 42, 43

*City & Cnty. of San Francisco v. Garland*,
  42 F.4th 1078 (9th Cir. 2022) ................................................................ 44

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ..................................................................... 93,94

*Collins v. Horton*,
  505 F.3d 874 (9th Cir. 2007) ................................................................. 33

*Dedmon v. Staley*,
  315 F.3d 948 (11th Cir. 2003) ............................................................. 47

*Dunmore v. United States*,
  358 F.3d 1107 (9th Cir. 2004) ...................................................... 60, 61

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) .......................................................... 47, 48, 80

*Epic Games, Inc. v. Apple Inc.*,
  559 F. Supp. 898 (N.D. Cal. 2021) (*Apple* I) ................................... passim

*Epic Games, Inc. v. Apple Inc.*,
  67 F.4th 946 (9th Cir. 2023) (*Apple* II) ........................................... passim

*Far Out Prods., Inc. v. Oskar*,
  247 F.3d 986 (9th Cir. 2001) ................................................................. 36

*FN Herstal SA v. Clyde Armory Inc.*,
  838 F.3d 1071 (11th Cir. 2016) ............................................................. 66

*Ford Motor Co. v. United States*,
  405 U.S. 562 (1972) ................................................................... passim

*Forsyth v. Humana, Inc.*,
  114 F.3d 1467 (9th Cir. 1997) ............................................................... 48

ii

*Fortyune v. Am. Multi-Cinema, Inc.*,
  364 F.3d 1075 (9th Cir. 2004) ...................................................... 74, 81, 82

*FTC v. Indiana Fed. of Dentists*,
  476 U.S. 447 (1986) ......................................................................... 96

*FTC v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) .......................................................... 54

*Gardner v. Nike, Inc.*,
  279 F.3d 774 (9th Cir. 2002) .......................................................... 92

*Greenwood v. FAA*,
  28 F.3d 971 (9th Cir. 1994) ............................................................. 86

*Gregory v. Litton Sys., Inc.*,
  472 F.2d 631 (9th Cir. 1972) .......................................................... 97

*Hicks v. PGA Tour, Inc.*,
  897 F.3d 1109 (9th Cir. 2018) ........................................................ 44

*Hildebrand v. Bd. of Trs. of Michigan State Univ.*,
  607 F.2d 705 (6th Cir. 1979) ..................................................... 61, 65

*Hornbeck Offshore Servs., L.L.C. v. Salazar*,
  730 F.3d 402 (5th Cir. 2013) .......................................................... 75

*Hoselton v. Metz Baking Co.*,
  48 F.3d 1056 (8th Cir. 1995) .......................................................... 47

*Howard v. City of Coos Bay*,
  871 F.3d 1032 (9th Cir. 2017) ........................................................ 40

*Hynix Semiconductor Inc. v. Rambus Inc.*,
  No. C-00-20905, 2009 WL 292205 (N.D. Cal. Feb. 3, 2009) ............... 35

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) ........................................................ 72

*In re NCAA Athletic Grant In-Aid Cap Antitrust Litig.*,
  958 F.3d 1239 (9th Cir. 2020) ..................................................... 81, 83

*Int'l Salt Co. v. United States*,
    332 U.S. 392 (1947)................................................................. 68

*Jazzabi v. Allstate Ins. Co.*,
    278 F.3d 979 (9th Cir. 2002) ................................................. 67

*Kirola v. City & Cnty. of San Francisco*,
    860 F.3d 1164 (9th Cir. 2017) ............................................... 93

*Klein v. City of San Clemente*,
    584 F.3d 1196 (9th Cir. 2009) ............................................... 69

*Kramer v. Banc of Am. Sec., LLC*,
    355 F.3d 961 (7th Cir. 2004) ................................................. 66

*La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*,
    762 F.3d 867 (9th Cir. 2014) ............................................ 85,86

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)............................................................... 57

*Levi Strauss & Co. v. Blue Bell, Inc.*,
    778 F.2d 1352 (9th Cir. 1985) (*en banc*).............................. 36

*Love v. Villacana*,
    73 F.4th 751 (9th Cir. 2023) ................................................. 36

*Massachusetts v. Microsoft Corp.*,
    373 F.3d 1199 (D.C. Cir. 2004).............................................. 72

*Matsumoto v. Labrador*,
    No. 23-3787, 2024 WL 4927266 (9th Cir. Dec. 2, 2024) ...................... 97

*MetroNet Servs. Corp. v. Qwest Corp.*,
    383 F.3d 1124 (9th Cir. 2004) ......................................... 71, 74

*Millenkamp v. Davisco Foods Int'l, Inc.*,
    562 F.3d 971 (9th Cir. 2009) ................................................. 53

*Murthy v. Missouri*,
    603 U.S. 43 (2024)........................................................... 95, 98

iv

*N. Pacifica, LLC v. City of Pacifica,*
366 F. Supp. 2d 927 (N.D. Cal. 2005) ..................................................... 32

*Nat'l Soc'y of Pro. Eng'rs v. United States,*
435 U.S. 679 (1978) .......................................................................... 69, 71

*NCAA v. Alston,*
594 U.S. 69 (2021) ....................................................................... 73, 75, 92

*NCAA v. Bd. of Regents of Univ. of Okla.,*
468 U.S. 85 (1984) ................................................................................. 57

*Newcal Indus., Inc. v. IKON Off. Sol.,*
513 F.3d 1038 (9th Cir. 2008) .......................................................... 47,48

*Novell, Inc. v. Microsoft Corp.,*
731 F.3d 1064 (10th Cir. 2013) .............................................................. 71

*Nw. Acceptance Corp. v. Lynnwood Equip., Inc.,*
841 F.2d 918 (9th Cir. 1988) ................................................................. 32

*Nw. Requirements Utilities v. FERC,*
798 F.3d 796 (9th Cir. 2015) ................................................................. 96

*Ohio v. Am. Express Co.,*
585 U.S. 529 (2018) ............................................................................... 59

*Olin Corp. v. FTC,*
986 F.2d 1295 (9th Cir. 1993) ............................................................... 41

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.,*
20 F.4th 466 (9th Cir. 2021) .......................................................... passim

*Pac. Bell Tel. Co. v. linkLine Commc'ns Inc.,*
555 U.S. 438 (2009) ............................................................................... 71

*Pals v. Schepel Buick & GMC Truck, Inc.,*
220 F.3d 495 (7th Cir. 2000) ................................................................. 61

*Pradier v. Elespuru,*
641 F.2d 808 (9th Cir. 1981) ................................................................. 65

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*,
    615 F.3d 412 (5th Cir. 2010) .................................................................. 56

*Seattle Pac. Univ. v. Ferguson*,
    104 F.4th 50 (9th Cir. 2024) ................................................................... 93

*SEC v. Jensen*,
    835 F.3d 1100 (9th Cir. 2016) .......................................................... 61, 67

*SEC v. Murphy*,
    50 F.4th 832 (9th Cir. 2022) ................................................................... 83

*SEC v. Stein*,
    906 F.3d 823 (9th Cir. 2018) ................................................................... 36

*Skidmore v. Led Zeppelin*,
    952 F.3d 1051 (9th Cir. 2020) (en banc) ............................................... 54

*Skillsky v. Lucky Stores, Inc.*,
    893 F.2d 1088 (9th Cir. 1990) ................................................................ 32

*Smith v. Marsh*,
    194 F.3d 1045 (9th Cir. 1999) ................................................................ 94

*Staley v. Gilead Scis., Inc.*,
    446 F. Supp. 3d 578 (N.D. Cal. 2020) .................................................... 37

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) ..................................................... 85, 86, 90

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*,
    402 U.S. 1 (1971) .................................................................................... 94

*Taylor v. Sturgell*,
    553 U.S. 880 (2008) ................................................................................ 42

*Thompson v. Parkes*,
    963 F.2d 885 (6th Cir. 1992) .................................................................. 66

*Tomlinson Black N. Idaho v. Kirk-Hughes*,
    361 Fed. App'x 712 (9th Cir. 2009) (unpublished memorandum) ... 61, 64

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ................................................................. 94

*True Drilling Co. v. Donovan*,
    703 F.2d 1087 (9th Cir. 1983) ................................................. 35

*U.S. Healthcare, Inc. v. Healthsource, Inc.*,
    986 F.2d 589 (1st Cir. 1993) ................................................... 37

*United Press Ass'n v. Charles*,
    245 F.2d 21 (9th Cir. 1957) ..................................................... 66

*United States v. Cont'l Can Co.*,
    378 U.S. 441 (1964) ................................................................. 41

*United States v. E.I. DuPont de Nemours & Co.*,
    366 U.S. 316 (1961) ................................................................. 69

*United States v. Glaxo Grp. Ltd.*,
    410 U.S. 52 (1973) ................................................................... 72

*United States v. Heredia*,
    483 F.3d 913 (9th Cir. 2007) ....................................... 45, 46, 59

*United States v. Holtzman*,
    762 F.2d 720 (9th Cir. 1985) ........................................... 30, 81

*United States v. Kaytso*,
    868 F.2d 1020 (9th Cir. 1988) ................................................. 35

*United States v. Microsoft Corp.*,
    87 F. Supp. 2d 30 (D.D.C. 2000), *aff'd in part, rev'd in part and
    remanded*, 253 F.3d 34 (D.C. Cir. 2001) ............................... 8,9

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ................. 68

*United States v. Philadelphia Nat'l Bank*,
    374 U.S. 321 (1963) ................................................................. 55

*United States v. Topco Assocs., Inc.*,
    405 U.S. 596 (1972) ................................................................. 55

vii

*Uzuegbunam v. Preczewski*,
    592 U.S. 279 (2021)................................................................. 97

*Verizon Comm'cns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)........................................................... 71, 76

*Yan Fang Du v. Allstate Ins. Co.*,
    697 F.3d 753 (9th Cir. 2012) ............................................ 45, 57

*Yowell v. Abbey*,
    532 F. App'x 708 (9th Cir. 2013) ........................................... 85

## Statutes & Rules

28 U.S.C. § 1407(a) ...................................................................... 62

Cal. Civ. R. 3-12(b) ..................................................................... 40

Clayton Act § 7 ............................................................................ 55

Fed. R. App. P. 32(a)(5)................................................................. 1

Fed. R. App. P. 32(a)(6)................................................................. 1

Fed. R. App. P. 32(f)...................................................................... 1

Fed. R. Civ. P. 16(e) ..................................................................... 66

Fed. R. Civ. P. 39(c) ............................................................... 60, 61

Fed. R. Civ. P. 61 .......................................................................... 66

Fed. R. Civ. P. 65(d) .......................................... 30, 81, 82, 83

## Other Authorities

David Glasner & Sean P. Sullivan, *The Logic of Market Definition*,
    83 Antitrust L.J. 293 (2020)..................................................... 38

Gregory J. Werden, *Four Suggestions on Market Delineation*,
    37 Antitrust Bull. 107 (1992).................................................... 39

Hovenkamp, *Federal Antitrust Policy* (6th ed. 2020) ................................ 41

Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (5th ed.) .............................. 38

Phillip Areeda, *Market Definition and Horizontal Restraints*, 52 Antitrust L.J. 553 (1983) ...................................................... 38

Rest. 2d Judgments § 27 (1982) ................................................... 43

Rest. 2d Judgments § 29 (1982) ................................................... 35

U.S. Const. amend VII ......................................................... 61, 67

U.S. Dep't of Justice & Fed. Trade Comm'n, *Merger Guidelines* (2023) ................................................................................. 41

ix

## INTRODUCTION

This case is a reckoning long overdue. The trial record is replete with proof of Google's years-long strategy to suppress competition among app stores and payment solutions in the Android ecosystem. Google's internal documents clearly detail the "combination of tactics" Google employed because it believed "competing on price…is prone to be a race to the bottom". 7-SER-1246. Despite Google's intentional destruction of evidence and attempted concealment through what Google lawyers called "fake privilege", trial exposed the multiple ways in which Google systematically obstructed every avenue for rivals to compete.

Among other things, Google required all Original Equipment Manufacturers that make Android smartphones ("OEMs") to preference its app store (called Google Play) and paid most OEMs for complete exclusivity. Google required all OEMs to impose technical and other obstacles (often called "friction") to dissuade users from obtaining apps outside Google Play. Google paid app developers to withhold exclusive content from Google Play's rivals, and paid potential competitors not to launch competing app stores. And having squashed competing app stores, Google required developers using Google Play also to use Google's own payment solution (called Google Play Billing) for which Google imposed an exorbitant fee. As a result, only 3% of Android devices in the United States have successfully installed a competing app store. Would-be competitors—from small

1

innovators to powerful companies like Amazon—have been fenced out. On the basis of ample evidence of Google's wrongdoing, after 15 days of trial, a jury unanimously found Google liable for unlawful restraints of trade, monopolization and tying.

Following the verdict, the district court conducted a months-long remedy proceeding, with extensive written submissions from the parties, including fact and expert witnesses. The court also held two evidentiary hearings, where it heard from Google fact witnesses and six expert witnesses. The court then entered an injunction that reflected input from both sides, accepting and rejecting some of each party's proposals. The injunction is crafted to stop Google's unlawful conduct and address its continuing adverse effects, while allowing Google to compete on the merits—and it terminates in just three years.

On appeal, Google says remarkably little about the conduct in which it engaged. It instead bemoans the fact that in a different case with a different record regarding different conduct by a different company (Apple), the outcome was partially different. *See Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946 (9th Cir. 2023) ("*Apple* II") (affirming judgment in Apple's favor on antitrust claims but also affirming a nationwide injunction against Apple for violating state unfair competition law). Google decries the "inconsistent results" (Br.3) but elsewhere acknowledges the significant differences between how Google and Apple have

2

structured their businesses.  (*See*, *e.g.*, Br.8 ("Apple has taken a very different approach."); *id.* (noting "the different philosophies that Google and Apple bring to their operating systems").)  Whereas Apple has vertically integrated its hardware, operating system and app store, Google publicly touts Android as an "open alternative" (Br.7)—but then uses an array of restrictive contracts to obstruct competition.  These very different commercial choices can have different legal consequences; for example, companies can take actions unilaterally that would be unlawful if taken in concert with others.  It is not "inconsistent" for each company's different conduct to be assessed individually, based on different trial records, leading to different results.

Consistent with the "blunderbuss" approach it took below, 1-ER-8, Google launches a fusillade of challenges to both the jury verdict and the injunction.  Its challenges based on *Epic v. Apple* ignore the differences between the cases—and Google's inexcusable delay in raising these arguments.  Neither preclusion nor precedent requires assessing Google's web of agreements with OEMs and developers through the market definition framework used to assess Apple's vertical integration—particularly when Google never presented that framework to the jury.  Google's assertion that it was prevented from arguing to the jury that its conduct helped Android compete with Apple is likewise incorrect; Google presented extensive evidence and argument in support of that alleged justification,

without any limitation from the court. The jury heard it, was instructed properly about it and rejected it on the merits. And Google's claim that it was error for the jury to hear the case is unprecedented and unfounded. Google consented to a jury and its last-minute effort to withdraw that consent came way too late. Regardless, Google identifies no legal basis on which holding a jury trial rather than a bench trial could be reversible error.

Google's attacks on the district court's injunction are also flawed. When a defendant violates the antitrust laws, courts have broad discretion to craft remedies that will end the unlawful conduct and deny the wrongdoer the ongoing fruits of its misconduct. The district court here exercised that discretion thoughtfully, taking into account the gravity and pervasive impact of Google's offenses, leavened by sensitivity to the risks of intervention.

The court found that Google's violations entrenched its dominant position and perpetuated "network effects" protecting Google Play from smaller rivals. The injunction properly takes aim at dismantling the "moat" that Google built, 1-ER-17, which cannot be eliminated by simply enjoining the specific past conduct. Affirmative steps are required here, and Google's attack on these affirmative steps (the catalog-access and store-distribution remedies) as imposing a "duty to deal" is unfounded. Having restrained trade and abused its monopoly power for years to impede competition, Google is properly subject to remedies intended to ameliorate

those harms and allow competition to take root.  Affirmative duties of the sort the district court ordered are well within the range of tools available to achieve those goals.  Google's multifarious other criticisms of the injunction are contradicted by the detailed record of the remedy proceedings and/or can be addressed through the technical committee process the district court established.

Contrary to Google's assertion, the district court did not "abdicate[] its basic duties by failing to justify and explain the relief".  (Br.29.)  Instead, the district court faced an egregious violation of the antitrust laws and a recalcitrant defendant committed to objecting to every remedy on every possible basis.  After a thorough process, the court sifted through those objections—both orally at the hearings and in its order accompanying the injunction—and fashioned a measured remedy to bring relief to consumers and developers.

It is time for that remedy to go into effect.

## STATUTORY AND REGULATORY PROVISIONS

Google's Addendum reproduces the pertinent statutory and regulatory provisions.

## JURISDICTIONAL STATEMENT

Epic agrees with Google's jurisdictional statement, except as to Epic's standing.  Epic has standing to obtain injunctive relief.

5

## STATEMENT OF ISSUES FOR REVIEW

1. Whether a unanimous jury verdict should be overturned because the district court in its discretion: (i) declined to give issue-preclusive effect to the judgment in a different case against Apple, where that case involved different issues, and Google's request was untimely; (ii) declined to instruct the jury on a single-brand aftermarket theory that was not supported by the record or raised at trial; (iii) instructed the jury to consider procompetitive benefits for consumers in the relevant market for Epic's monopolization claims, without limiting any procompetitive benefit evidence or argument Google presented; and (iv) rejected Google's last-minute attempt to withdraw its consent to a jury.

2. Whether the district court's well-reasoned injunction should be overturned because it: (i) includes a time-limited requirement that Google make modest changes to its existing infrastructure so as to remedy the continuing effects of Google's anticompetitive conduct; (ii) targets network effects caused by Google's misconduct; (iii) limits Google to charging reasonable fees for a small part of the injunction, to ensure Google cannot frustrate the remedy; and (iv) does not provide a detailed blueprint for compliance due to the evidence that Google has the technical means to comply.

3. Whether, by having standing to obtain injunctive relief, Epic is entitled to remedies that the district court reasonably determined were necessary to address the harm from Google's anticompetitive practices.

## STATEMENT OF THE CASE

### I.  Overview of the Android Ecosystem

Smartphones are portable devices that connect wirelessly to the internet and are capable of a wide variety of computing functions.  Smartphone manufacturers, also known as OEMs, develop smartphone hardware, such as the camera and the screen.  OEMs also pre-install an operating system on each device prior to its sale to the consumer.  6-ER-1421.

Google has developed and distributes the Android operating system.  6-SER-1024.  Google licenses Android to hundreds of OEMs.  5-ER-1061.  Apple develops the iOS operating system, but Apple does *not* license iOS to any OEM; it is used only in Apple iPhones.  6-ER-1421.  Barriers to entry in developing mobile operating systems are extremely high, and there have been no entrants since 2014.  6-ER-1250.  Today, 100% of all new smartphones with third-party operating systems (*i.e.*, not iPhones) sold worldwide, excluding China, use Android.  8-SER-1393; 6-ER-1249.  Google's dominance allows it to dictate licensing terms to OEMs who have no alternative to Android.  6-SER-1027-43.

Smartphone apps are software products separate from the operating system that provide additional functionalities. 5-SER-751-52. On Android smartphones, app developers can, in theory, make their apps available in the following ways: (1) through an app store, such as Google Play; (2) by partnering with OEMs or cellular carriers to pre-install their apps onto smartphones; and (3) by allowing consumers to download their apps directly from a website, a method known as "direct downloading" (or, using Google's pejorative label, "sideloading"). 5-SER-881; 6-SER-1039. In reality, Google imposes a variety of obstacles, referred to as "friction", that make it very hard for consumers to download directly from the web or from a store other than Google Play. 5-SER-920-21; 5-SER-803; 5-SER-811; 8-SER-1371. The more friction, such as more screens to click through or more menus to navigate, the fewer users complete a download. 5-SER-921. As a result, downloads of apps from Google Play (which are frictionless) account for more than 80% of all Android app downloads globally (excluding China) and over 95% of all Android app downloads in the United States. 8-SER-1394; 6-SER-1052-55.

For users, Android app stores are more attractive when they have more apps; for developers, stores are more attractive when they have more users. 7-SER-1271; 4-ER-732. Courts have recognized, and economic literature substantiates, that these "indirect network effects" mean that new entrants face significant barriers to entry, *see, e.g.*, *United States v. Microsoft Corp.*, 87 F. Supp. 2d 30, 36

(D.D.C. 2000), *aff'd in part, rev'd in part and remanded*, 253 F.3d 34 (D.C. Cir. 2001), sometimes labeled the "chicken and egg problem". New stores have difficulty attracting developers because they have few users and difficulty attracting users because they have few apps. Thus, virtually all developers distribute their Android apps through Google Play, attracting the vast majority of Android users to use Google Play exclusively. 7-SER-1271; 4-ER-730; 6-SER-1085.

Most apps are made available for free. Once a user obtains the app, many developers offer digital products or services that can be purchased within the app. 5-SER-761-62. These are known as in-app purchases.

For apps distributed through Google Play, Google requires all in-app purchases to be made exclusively through Google's in-app billing solution, Google Play Billing ("GPB"). Google charges a 30% commission for the vast majority of in-app purchases through GPB. 5-SER-774,784. Google levies this charge for each and every in-app purchase in perpetuity. 5-SER-795,789. In 2021, Google Play had an operating profit of 71%. 8-SER-1396; 6-SER-1021.

## II.    Epic and Its Case Against Google

Epic is a leading app developer for games and 3D engine technology. 5-SER-974-78; 5-ER-974. Epic also operates the Epic Games Store ("EGS") for PC and Mac, which it has long planned to expand to Android. 5-ER-975. Epic has

its own proprietary payment solution called Epic Direct Pay. 5-ER-1192-93. At various times, Epic's apps have been available for download on Android devices from Google Play and for direct download from Epic's website. 5-ER-1201.[1]

In August 2020, Epic filed a complaint against Google, alleging violations of the Sherman Act, Cartwright Act and California's Unfair Competition Law ("UCL") based on Google's anticompetitive conduct in two markets—the Android App Distribution Market and the Android In-App Billing Solutions Market. 4-SER-684-747.

On December 11, 2023, after hearing 15 days of testimony and argument, the jury delivered a unanimous verdict in favor of Epic on all counts put to it, finding that Google violated Sections 1 and 2 of the Sherman Act and the Cartwright Act. 1-ER-52-57. The jury's verdict was definitive: Google willfully acquired and/or maintained monopolies in the Android App Distribution and Android In-App Billing Solutions markets, entered into a variety of agreements that unreasonably restrained trade in those markets, and unlawfully tied the use of Google Play to the use of GPB. On October 7, 2024, after months of briefing, discovery, and hearings, the Court issued an injunction to remedy that anticompetitive behavior.

---

[1] EGS launched on Android after trial.

## III.  Google's Obstruction of Competition for Distribution of Android Apps.

Epic presented extensive evidence of Google's efforts to shield Google Play from competition for distribution of Android apps.  Google executives observed that "[t]he size and margins of the market are making it attractive for new entrants".  7-SER-1246.  They therefore strategized about what to do "in the face of increasing app store competition on Android, both from OEMs…and other large platforms (like Epic)".  7-SER-1248.  Google recognized that if competition developed, Google Play would have to "deliver[] superior user and dev[eloper] outcomes".  7-SER-1241.  Google did not want to compete.  Instead, Google deployed a web of strategies to foreclose competition.

### A. The Conduct

Google maintained its monopoly power over Android app distribution through a multi-layered web of anticompetitive conduct.

*Home Screen Placement Requirements (MADA).*  As the first layer, Google required OEMs licensing a commercially viable version of Android to install Google Play on the home screen of every device the OEM makes, ensuring Google Play had at least as prominent a placement on every Android device as any other store.  5-SER-916,17; 5-ER-1078; 5-SER-855.  Google entered into the agreement containing these requirements, called the Mobile App Distribution Agreement

11

("MADA"), with every OEM selling commercial Android phones.  6-SER-1033; 5-ER-1049-51; 5-ER-55-56; 5-SER-857-60.

*Scare Screens.*  Next, Google embedded frictions—*i.e.*, obstacles to hinder and delay the download process—that Google  designed to deter users from downloading apps from any source other than Google Play (and OEM stores, where those exist).  6-SER-1032,29; 6-SER-1154-55; 5-SER-991; 5-SER-811.  Specifically, Google requires users to go through a cumbersome sequence of steps, known as the "Unknown Sources" flow.  5-SER-960-62; 6-SER-997-99.  To navigate this process, users need to change their phone settings and repeatedly dismiss a multitude of scare screens.  For example, Google required at least 14 warning screens to pop up and be individually clicked through by a user who attempted to directly download an app from a developer's website.  5-SER-798, 800; 5-SER-888,896.  Importantly, the warnings and friction were triggered based *solely* on the source of the app (*i.e.* whether from Google Play or not), irrespective of any assessment of the threat from the specific app.  6-SER-1002-03.  As Google's CEO testified, an app downloaded from Amazon would be treated exactly the same as an app downloaded from the fictitious illstealyourinfo.com.  5-SER-924.

These frictions proved incredibly effective at deterring the use of alternatives to Google Play.  For example, even fans of *Fortnite*—which at the

time was the world's most popular game and attempted to distribute on Android outside Google Play—often abandoned the installation process; 35% of Android users failed to complete the download because of these frictions. 6-SER-1029-30. Other developers fared even worse; an Amazon executive testified that only 11% of the users who tried to install the Amazon Appstore on their Android phone actually succeeded. 5-SER-991. When Amazon offered users a 15% discount on all purchases to try and get traction, Google noted in an internal document that even with that discount, the "switching hurdle [is] too high for most users" to download Amazon's app store. 7-SER-1268.



As a result of Google's tactics, only 3% of Android phones in the United States have successfully downloaded an app store from the web. 6-SER-1085.

*Agreements and Projects to Prevent Competition.* Finally, Google employed an array of projects to either threaten or pay off potential competitors to prevent them from competing with, or facilitating competition with, Google Play.

Agreements Not to Compete (Project Hug). Google's "Project Hug" proposed hundreds of millions of dollars in special deals to top developers, in exchange for commitments not to launch their games or content exclusively outside Google Play.

Project Hug grew out of Epic's decision in 2018 to launch *Fortnite* off Google Play, and was motivated by Google's fear of what Google referred to as "contagion"—*i.e.*, that any launch off Play could "legitimize" another store, leading to an exodus of developers from Play. 5-SER-894. Google entered into Project Hug agreements with 22 top game developers, 5-SER-777, who Google believed posed the biggest threat to Google Play's hegemony because they were big enough to "go it alone" and distribute their games themselves or on other stores, 7-SER-1185. For example, Google paid Activision $360 million in cash and other benefits. 5-SER-967-71; 8-SER-1397-99. As a Google executive explained in an internal document, by targeting top developers and offering them in-kind benefits, Google could avoid "competing on price[,which] is prone to be a race to the bottom". 7-SER-591-92. Instead, Google wanted to maintain its monopoly by "lower[ing] the effective rev-share [for select developers] while

14

maintaining the prevailing rate" for all others.  *Id*.  Hug, the executive explained, was part of "a combination of tactics" that operate "in conjunction"; others are described below.



Exclusivity (RSA 3.0).  Google paid OEMs other than Samsung (which Google handled separately) hundreds of millions of dollars in exchange for Google Play being the exclusive app store on new devices.  5-SER-850-52; 5-SER-821; 5-SER-824-25.  Google targeted these agreements, called "RSA 3.0 premier tier agreements", at OEMs that were best positioned to start or expand an alternative app store that could compete with Google Play.  5-SER-869-70.  RSA 3.0 agreements covered roughly half of all new non-Samsung Android phones by 2022.  6-SER-1035-37; 6-SER-1160-61.

Samsung Non-Competes.  Samsung, due to its size and potential to effectively compete with Google Play, warranted its own separate project, known

as "Project Banyan".  Under Banyan, Google proposed to pay Samsung to turn its

Galaxy Store into a facade that would direct user purchases to Google Play.

7-SER-1255.  Samsung understood exactly what Project Banyan was intended to

achieve: "prevent unnecessary competition on store."  *Id*.



Once Project Banyan was called out by Samsung for what this was—a blatantly

illegal agreement not to compete—Google had no choice but to terminate it.

5-SER-873; 5-SER-902.

But Google did not end its efforts to keep Samsung from competing with

Google Play.  Google instead agreed to pay Samsung $8 billion over four years to

make Google Play, plus Google's search engine and voice assistant, the default on

Samsung smartphones.  5-SER-874-75.  At the same time, Google obtained

assurances from Samsung that "exclusive game launches would not be part of [Samsung's] core strategy going forward". 5-SER-899. As a result, even though its store accounts for a de minimis (~1%) share of Android app downloads, Samsung has not sought to compete with Google Play. 5-SER-874-75; 5-SER-899; 6-SER-1048-49; 8-SER-1395.

## B. The Market for Android App Distribution.

Epic proved at trial that the relevant market for assessing Google's conduct was limited to distribution of Android apps (the "Android App Distribution" market) and did not include distribution of apps on other platforms, like Apple's iPhones. Epic presented ample economic evidence showing that app distribution on Android devices is not sufficiently constrained by competition from app distribution on iPhones to prevent Google from exercising market power. Among other reasons, the costs associated with obtaining and switching to a new phone deter users from switching from app distribution on Android to app distribution on an iPhone. 6-SER-1058-72.

Epic's market definition accords with Google's contemporaneous characterizations of the competitive landscape. Google identified the "existential" question for Google Play: "How do we continue to keep Play as the preeminent distribution platform *for Android*?" 8-SER-1403 (emphasis added). As noted, Google executives strategized about what to do "in the face of increasing app store

17

competition on *Android*, both from OEMs…and other large platforms (like Epic)".
7-SER-1248 (emphasis added). As part of Project Hug, Google offered to pay
hundreds of millions to developers, including Epic, not to launch their apps outside
Google Play *on Android*, but never made such offers to developers who threatened
to launch initially or only on the Apple App Store. 5-SER-891-93, 899, 907-11;
7-SER-1180-1227; 7-SER-1300-51; 5-SER-967-70; 8-SER-1397-99.

Likewise, RSA 3.0 had nothing to do with Apple, as it paid OEMs to
maintain Google Play exclusivity on Android devices. 6-SER-1147-51; 5-ER-
1048-49; 7-SER-1253 (listing RSA 3.0 as part of a strategy to "protec[t] against
Play risk with OEMs, complementing Hug and Banyan").

By contrast, at trial, Google asserted a relevant market for the "facilitation of
digital content transactions", which its expert described as "a market for the
making sure that downloading an app, purchasing content in an app, and
consuming content in an app are all going well". 6-SER-1122. Notably, this
market was *not* the mobile gaming transactions market that the district court used
to consider Apple's very different conduct in the *Epic v. Apple* case. Google never
asserted that as a proposed relevant market. Instead, Google's expert contended
that the proper market encompassed virtually "anything online", including app
stores; payment solutions; internet browsers; the Android operating system; other

operating systems; and apparently much more. 6-SER-1121-23; 6-SER-1130-31. The jury correctly rejected this market definition.

## IV. Google's Anticompetitive Conduct Regarding Android In-App Billing Solutions.

The evidence that Google engaged in anticompetitive conduct to maintain its monopoly in the Android In-App Billing Solutions Market was similarly strong.

Most notably, Google tied its monopolized app distribution with its own in-app payment solution, requiring that developers distributing apps through Google Play use GPB for all in-app purchases of digital content and pay Google a hefty and arbitrary revenue share of up to 30%. 5-SER-878,904; 7-SER-1289-91. The evidence at trial showed that developers find GPB to be an inferior, overpriced product, and would prefer to employ a different billing solution. 5-SER-809,814,817; 5-SER-834-39; 6-SER-1011-15; 6-SER-1016-17; 5-SER-769; 5-SER-985-86. Even the head of YouTube—which is owned by Google— objected to using GPB, declaring that "[i]t's damaging for our business." 8-SER-1353.

The evidence at trial showed, and the jury correctly found, that there was a separate product market for Android In-App Billing Solutions. As Android's co-founder Rich Miner explained at trial, GPB is a separate product from Google Play and was developed by an entirely different team. 6-SER-1134. Further, the record showed that developers have separate demand for in-app billing solutions and for

19

app distribution.  Specifically, prior to 2020, Google allowed developers that sold certain types of digital content to use an in-app payment method other than GPB, and several developers took advantage of that opportunity while continuing to distribute their apps through Google Play.  6-SER-1081-21 (referencing Tinder, Hulu, Netflix, Amazon Kindle, YouTube and Spotify).  And several developers, including Epic, testified that they would use alternative billing solutions if they could.  See 5-ER-1192-94; 5-SER-792; 5-SER-765-66; 5-SER-808-10; 5-SER-830-31; 6-SER-1008.

## V.    Google's Proposed Business Justifications Were Pretextual.

Google attempted to justify its restrictions on Android competitors by arguing that they helped Android compete with Apple.  "Google spared no opportunity at trial to tell the jury of its views about competition with Apple." 1-ER-34.

But these claims were contradicted by evidence Epic presented.  Epic showed that users choosing between Android phones and iPhones do not consider app distribution (or app distribution pricing) to be a meaningful factor.  *See e.g.,* 6-SER-1068-69.  Internal Google documents showed that the motivating reason behind Google's challenged conduct was a desire to maintain its monopoly profits and prevent the "contagion" of competition *on Android*.  5-SER-894; 7-SER-1305. Moreover, Apple was often absent from Google's internal documents discussing

20

Android app distribution and payment solutions.  The jury ultimately rejected Google's effort to justify its conduct by showing that stifling competition among Android stores and payment solutions would make Android more competitive with iPhones.

## VI.  Google's Intentional Destruction of Relevant Evidence.

Epic presented overwhelming evidence of Google's anticompetitive conduct.  But Epic also proved that Google went to extraordinary lengths to conceal evidence of its wrongdoing.  For years, Google employees were encouraged to use—and did use—ephemeral, "history off" instant messaging on Google's Chat platform for sensitive business communications.  Google designed "history off" Chats to be destroyed in 24 hours—and Google kept Chats as "history off" by default for all employees, even those on a litigation hold.

Epic filed a motion for sanctions relating to this issue in October 2022.  On March 28, 2023, after extensive briefing and two evidentiary hearings, the district court found that "Google intended to subvert the discovery process" and that plaintiffs were prejudiced because "substantive business communications were made on Chat that plaintiffs will never see".  4-SER-616; 1-SER-4.  Google urged the court not to give an adverse inference instruction based on these pre-trial findings, but instead to allow the jury to hear evidence regarding Google's

21

document destruction and defer a decision on an appropriate instruction until after trial. The court obliged. 1-SER-4-5.

At trial, Epic demonstrated that Google's destruction of evidence was systematic and pervasive. Multiple Google witnesses testified they used "history off" Chats on a daily basis, did so specifically to discuss sensitive information—including information related to the litigation—and continued to do so even after they received hold notices. Contemporaneous documents evidenced this Google-wide practice. For example, one employee asked "would it be too much to ask you to turn history off?...lots of sensitivity with legal these days :)". 8-SER-1384. When another employee noted the need to have "history on" because of the litigation hold in this case, others proposed to remove him from the Chat and bragged "I talk about RSA related things all day and I don't have history on for all my chats :)". 8-SER-1382-83.

Moreover, evidence at trial demonstrated that Google employees had a practice of looping in attorneys on sensitive documents in an attempt to shield them from discovery in litigation—a practice that Google lawyers referred to as "fake privilege". 8-SER-1385-87; 8-SER-1388-92.

In light of the evidence, the district court concluded that "a mandatory adverse inference instruction would be amply warranted", 1-ER-74; 2-SER-113, and that "this presents the most serious and disturbing evidence I have ever seen in

my decade on the bench with respect to a party intentionally suppressing potentially relevant evidence in litigation." 1-ER-73. Nonetheless, the district court declined to give such an instruction, instead "tak[ing] the more conservative approach" of giving only a permissive instruction. 1-ER-75.

## VII. Relevant Procedural History

For most of the pretrial proceedings, Epic's case was coordinated with four other cases brought against Google by classes of consumer and developer plaintiffs, thirty-seven State Attorneys General ("State AGs") and Match Group Inc. (collectively, "Plaintiffs").[2] In March 2023, Google settled with the developer class plaintiffs. On October 11, 2023, Google settled with the State AGs and the consumer class plaintiffs. On October 31, 2023, Google settled with Match. Consequently, on November 6, 2023, Epic alone proceeded to trial. Set forth below are relevant aspects of the procedural history.

### A. Google's Motion in Limine

On September 22, 2023, six weeks before trial, Google served its motions *in limine*, arguing for the first time that Epic should be precluded from presenting evidence and argument to the jury proving its Android app distribution and in-app payment solutions markets, in light of the district court's decision in *Epic Games*

---

[2] No. 5:20-cv-05671; No. 3:20-cv-05792; No. 3:21-cv-05227; No. 3:22-cv-02746.

*Inc. v. Apple Inc.* issued two years prior on September 10, 2021. 4-ER-867,875. This motion was filed months after the parties had completed expert discovery and briefed summary judgment, and following months of negotiations around Google's demand that at trial, a single economic expert would present the jury with a single market definition on behalf of all Plaintiffs.[3] The district court denied Google's motion *in limine* on three separate grounds: it was made far too late; it violated the district court's standing order for civil jury trials, which prohibits using motions *in limine* as "substitutes for summary judgment or other dispositive motions"; and it did not establish the required elements for issue preclusion. 1-ER-158-59; 1-SER-3-4.

## B. Google's Last-Minute Effort to Avoid a Jury

Google's Answer and Counterclaims, filed in October 2021, demanded a jury trial on all claims so triable. 4-SER-672-75. For the next two years, the parties repeatedly agreed to hold a single jury trial for all Plaintiffs' claims, including Epic's. 4-ER-919-20; 4-SER-644; 4-SER-632; 4-ER-902; 4-SER-508. Then, on November 1, 2023—after a venire had been selected, questionnaires were sent out, responses were collected, and jury selection was set to begin—Google

---

[3] Throughout negotiations, Google never suggested Epic was precluded from presenting the same market that other Plaintiffs would present. 4-SER-525-26.

asked the court to jettison the jury and hold a bench trial. The court denied this request, finding that it came "far too late" and that dispensing with the jury two court days before trial was set to commence "would have caused immense prejudice to Epic" as well as the court. 1-ER-50-51.

## VIII.    The Court Entered a Remedy Based on the Jury Verdict.

### A. Remedies Proceedings

Following the jury verdict, the court directed Epic to file a proposed injunction with supporting expert statements and permitted Google to respond with its own proposal and expert statements. 4-ER-824-25. Epic's proposed injunction included provisions restricting the anticompetitive conduct found by the jury and related practices with similar anticompetitive effects. It also included three provisions to address the network effects that Google had unlawfully obtained as a result of its anticompetitive practices: (1) permitting third-party Android app stores to search Google Play's catalog of apps and offer them to users (from Google Play), with Google still retaining any fees payable by the apps' developers ("catalog access"), (2) permitting users to have their existing Google Play apps updated by a third-party app store going forward ("library porting"), and (3) requiring Google Play to distribute third-party Android app stores via Google Play ("store distribution"). *Id*. In response, Google submitted 90 pages of objections,

3-ER-573-665, as well as two expert declarations and three additional fact declarations.

The district court held an evidentiary hearing on remedies on May 23, 2024. The court heard testimony from both parties' experts on how to tailor an injunction to "terminat[e] Google's illegal conduct" and "restore the opportunity to compete for all competitors". 3-ER-440-41. With the court's leave, Google then submitted another 25-page proffer on the technical feasibility and associated costs of catalog access, library porting and store distribution, along with four more declarations from Google employees. 9-ER-2023-50. Epic submitted a response supported by two expert declarations. 2-SER-67-96. The district court then held another evidentiary hearing, and heard closing arguments on the proposed remedies, on August 14, 2024. As the court later observed, Google had "virtually unlimited opportunity to present its views about the scope and content of an injunction." 1-ER-8.

## B. The District Court's Injunction

The district court issued a permanent injunction on October 7, 2024 that balanced both sides' proposals. The injunction enjoins Google, for a limited period of three years, from entering into or enforcing certain types of anticompetitive agreements. 1-ER-3-6. It also requires Google to "permit third-party Android app stores to access the Google Play Store's catalog of apps" and

enjoins Google from "prohibit[ing] the distribution of third-party Android app distribution platforms or stores through the Google Play Store". 1-ER-4-5. The injunction gives Google eight months to implement the catalog-access and store-distribution provisions. 1-ER-5. In its order accompanying the injunction, the district court specifically addressed Google's proffer, rejecting some arguments and accepting others. 1-ER-7-23. For example, the court accepted Google's proposal that it be able to review apps listed on third-party stores distributed through Google Play, subject to certain limitations, and that it be able to charge a reasonable fee for these services. *Id.*

## SUMMARY OF ARGUMENT

**I.** Given the overwhelming evidence of its unlawful activity, Google focuses its liability challenges on technical and procedural issues, none of which has merit. *First*, the market definition used in *Epic v. Apple* to assess Apple's vertically integrated platform did not preclude Epic from proving that the competitive effects of Google's distinct conduct—a web of agreements with OEMs and developers—should be assessed through a different market lens. The district court also acted within its discretion to conclude that Google raised issue preclusion too late in the proceedings.

*Second*, the district court properly declined Google's request that the jury be instructed to assess whether Epic had proved "single-brand aftermarkets". Google

27

did not present the issue during trial, and introducing it for the first time in jury instructions would have been deeply confusing. It would also have been wrong. As a matter of law, the markets Epic proved were not single-brand aftermarkets because such markets would depend on users' having acquired a durable product from Google in a foremarket. *See Apple II*, 67 F.4th at 976. In fact, users acquire Android smartphones from a variety of OEMs, and Google contracts separately with those OEMs to impose the challenged restrictions.

*Third,* the district court did not unduly limit the jury's consideration of procompetitive justifications. The court permitted Google to attempt, at great length, to defend its conduct as a way to help Android compete with Apple. The jury rejected that defense. Google cites no error in the instructions on Epic's restraint of trade claim. That dooms Google's crabbed reading of the monopolization instructions, because Google presented the same procompetitive justifications on both claims, and the jury found them insufficient. Regardless, the law does not require consideration of procompetitive justifications outside the relevant market.

*Fourth*, the district court's rejection of Google's last-minute attempt to withdraw its consent to a jury trial was well within its discretion. Google cites no case reversing a judgment on the ground that the court held a jury trial instead of a bench trial.

**II.** To remedy years of anticompetitive behavior affecting millions of consumers and developers, the district court issued a thoughtful injunction that ends Google's wrongful conduct and addresses its most pernicious ongoing effects, but allows Google to continue to compete vigorously on the merits. Google's grab bag of challenges should be rejected.

*First*, Google wrongly conflates (1) the restrictions on when a refusal to deal can be a basis for *liability* with (2) the *remedies* a court can impose when a defendant has committed a separate antitrust violation. Violating the law has consequences. Courts have broad discretion to craft injunctions that address the ongoing adverse effects of a defendant's anticompetitive conduct, and many courts have required antitrust violators to transact with others in specified ways. The district court's time-limited order remediating Google's misconduct does not require Google to create a "new product". The extensive record on remedies shows that Google can comply with the injunction by instituting modest changes to existing infrastructure.

*Second*, Google's claim that the competition-suppressing network effects targeted by the injunction were not caused by Google's misconduct ignores the trial record and the court's findings. The jury found that Google unlawfully impeded competition for years, which the court found preserved the "moat" of network effects and "entrench[ed]" Google's market position.

29

*Third,* in its store-distribution remedy, the district court accommodated Google's request to review third-party app stores and to charge the stores for doing so.  Google's contention that the district court could not prevent Google from charging exorbitant prices that negate the remedy, or limit its effectiveness, was not an abuse of discretion.  Instead, it was a reasonable measure to avoid circumvention of the injunction.

*Fourth,* Google's vagueness challenge fails.  Rule 65(d) requires "fair notice" of what is prohibited or required, not a detailed blueprint for compliance.  Injunctions fail on this ground only when they have "no reasonably specific meaning".  *United States v. Holtzman*, 762 F.2d 720, 726 (9th Cir. 1985).  The injunction here easily clears that low bar.  It also provides an eight-month runway for addressing any implementation details with aid of a technical committee subject to appropriate judicial oversight.

*Fifth,* the district court more than adequately explained its decision.  It had no obligation to address with specificity each one of the "ocean of comments" that Google raised.  1-ER-8.  The court's order amply lays out its reasoning on the relevant issues that were properly presented, with sufficient detail to facilitate this Court's review.

**III.**  Google's standing arguments are without merit.  Epic has indisputably shown injury redressable by an injunction, meaning that Article III is satisfied.

Google's challenges to the *scope* of the remedy are equitable, not jurisdictional. Many of them are therefore waived for not having been raised below. Those challenges also fail on the merits because trial evidence, expert testimony and economic principles established that the injunction's remedies would all redress harm to Epic.

## ARGUMENT

### I. Google's Challenges to the Liability Verdict Should Be Rejected.

#### A. Issue Preclusion Did Not Bar the Jury's Market Definition Findings.

Google argues that the judgment must be reversed based on preclusion from Epic's prior lawsuit against Apple. (Br.31-37.) But the district court here was well within its discretion to rule that Google waived its issue preclusion argument by failing to raise it in a timely manner. In any event, the district court did not abuse its discretion in denying Google's argument on the merits because the elements of issue preclusion were not met.

##### 1. Google Waived Its Preclusion Defense by Not Asserting It in a Timely Manner.

The district court reasonably found that Google asserted preclusion far too late in the proceedings. Google had ample opportunity to assert this defense through an appropriate motion much earlier. But Google held back until *in limine* motions, filed a month before trial. 4-ER-872. The court found that, pursuant to

court rules, Google's issue preclusion argument "should have been raised in a summary judgment motion" and that there was no "good cause excusing the delay". 1-SER-3; *see* 1-ER-158-59. By failing to challenge the district court's timeliness decision on appeal (*see* Br.31-40), Google has waived any appeal on issue preclusion. *See Balser v. Dep't of Justice, Off. of U.S. Tr.*, 327 F.3d 903, 911 (9th Cir. 2003).

In any event, a district court's refusal to consider an argument as untimely is reviewed for abuse of discretion. *Nw. Acceptance Corp. v. Lynnwood Equip., Inc.*, 841 F.2d 918, 926 (9th Cir. 1988). This discretion is particularly important in handling issue preclusion, a doctrine whose purpose is "to promote judicial efficiency". *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1160 (9th Cir. 2002). Thus, even where a party pleads issue preclusion as a defense, where there is "undue delay" in asserting issue preclusion, and "unfair surprise" to the opposing party, it is "appropriate to deem the [issue] preclusion argument waived". *N. Pacifica, LLC v. City of Pacifica*, 366 F. Supp. 2d 927, 930 (N.D. Cal. 2005).[4]

---

[4] *Skillsky v. Lucky Stores, Inc.*, 893 F.2d 1088 (9th Cir. 1990) (Br.17 n.4), is consistent. It confirms that the timeliness of asserting an issue preclusion defense "is within the sound discretion of the district court". *Id.* at 1096. That the *Skillsky* district court allowed the defense—in a straightforward labor dispute—says nothing about whether the district court abused its discretion here, where the

The district court's timeliness decision was well within its discretion. Even if Google's issue-preclusion theory were correct (it is not), Google forfeited the argument through delay, and the court reasonably rejected Google's prejudicial effort to raise it for the first time shortly before trial.

The record of Google's delay is undisputed. The district court decision in *Epic v. Apple* was issued on September 10, 2021, *see* 559 F. Supp. 3d 898 ("*Apple I*"), more than two years before Google argued issue preclusion to the district court. *See Collins v. Horton*, 505 F.3d 874, 882 (9th Cir. 2007) ("We have held that a final judgment retains its collateral estoppel effect, if any, while pending appeal."). While Google's Answer listed collateral estoppel in one sentence, as the eleventh of twelve potential defenses, 4-SER-639, Google did not assert the defense during the entirety of the pretrial proceedings. On September 19, 2022, Google served its expert reports, which did not advocate for the market the court used in *Apple I*, and Google said nothing about issue preclusion. Indeed, Google *never* advocated for the "digital mobile gaming transactions" market from *Apple I*, 559 F. Supp. 3d at 921. Instead, Google consistently asserted a market for the "facilitation of digital content transactions". *See* 6-SER-1121,1126-27; 6-SER-

---

parties had spent a year litigating through complex expert discovery the precise issue Google suddenly claimed to be precluded.

1175.  Nor did Google at any point—through its experts or otherwise—suggest that Epic's experts were proposing markets Epic was supposedly precluded from proving.

In the winter and spring of 2023, Google insisted that all Plaintiffs  present at trial a single market definition, through a single expert; Google never suggested Epic was barred from presenting the Android-specific markets that all Plaintiffs were advancing.  4-SER-517-42.  On April 20, 2023, Google filed its summary judgment motion, which again remained silent on issue preclusion.  4-SER-564-98. On April 24, 2023, this Court decided *Apple II*, 67 F.4th 946.  Still Google waited. Google first asserted the issue in a motion *in limine* filed on October 5, 2023, 4-ER-872, for argument at the pretrial conference on October 19, a mere two weeks before trial.  2-SER-158; 2-SER-154.  The district court found that this was not only belated, but also violated the court's standing order on civil jury trials, which states that "[m]otions *in limine* should be used for evidentiary issues…. They are not substitutes for summary judgment or other dispositive motions."[5]  *See* 1-ER-159 ("My standing order expressly states that you cannot bring a covert

_____

[5] Standing Order for Civil Jury Trials Before Judge James Donato ¶¶ 5-6, *available at* https://www.cand.uscourts.gov/wp-content/uploads/judges/donato-jd/JD_Standing-Order-for-Civil-Jury-Trials.pdf.

summary judgment motion in the MIL, which is effectively what Google is doing.").

The district court did not abuse its discretion concluding that, in this case, with its multi-year history, fairness (and the court's rules) required Google to assert a defense as fundamental as preclusion on market definition far earlier. Google's delay prejudiced Epic because by the time Google asserted the defense, Epic had developed the fact evidence, presented expert testimony on market definition and prepared for trial.

### 2. Google's Preclusion Argument Fails on the Merits.

Nor did the district court abuse its discretion in denying Google's preclusion argument on the merits. Even when the elements of issue preclusion are established, "the decision whether to apply the doctrine is within the discretion of the trial court." *United States v. Kaytso*, 868 F.2d 1020, 1022 (9th Cir. 1988); *see also True Drilling Co. v. Donovan*, 703 F.2d 1087, 1093 (9th Cir. 1983); Rest. 2d Judgments § 29 (1982). And trial courts retain even broader discretion to reject *non-mutual* issue preclusion asserted by those, like Google, who were not parties to the original litigation. *See Blonder-Tongue Lab'ys., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 333-34 (1971) ("In the end, decision will necessarily rest on the trial courts' sense of justice and equity."); *see also Hynix Semiconductor Inc. v. Rambus Inc.*, No. C-00-20905, 2009 WL 292205, at *1-2 (N.D. Cal. Feb. 3, 2009) (holding

that courts have discretion in applying non-mutual issue preclusion, whether used offensively or defensively); *Callahan v. PeopleConnect, Inc.*, No. 20-cv-09203-EMC, 2022 WL 2132912, at *4 (N.D. Cal. June 14, 2022) (same).  This Court reviews *de novo* whether preclusion is *available*, but when it is, the decision whether to *apply* it under the circumstances is reviewed for abuse of discretion. *SEC v. Stein*, 906 F.3d 823, 828 (9th Cir. 2018).[6]

To assert issue preclusion, Google must establish four elements: "(1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated and decided in the prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the merits."  *Love v. Villacana,* 73 F.4th 751, 754 (9th Cir. 2023).  Elements one and four are not met.

(a) <strong>The Market Definition Question in <em>Apple</em> Was Not "Identical".</strong>

Google fails at the very first step.  The "issue at stake" was not "identical" in both proceedings.  "Similarity between issues does not suffice; collateral estoppel is applied only when the issues are *identical*."  *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1357 (9th Cir. 1985) (*en banc*) (emphasis added) (rejecting

---

[6] Google's reliance on *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986 (9th Cir. 2001), for a *de novo* standard is misplaced.  (Br.31.)  That was a case where preclusion was *unavailable* under applicable law.  *Id.* at 993.

issue preclusion from a trademark judgment about pocket tabs for pants in a case about pocket tabs for shirts).  To assess whether the "issue at stake" in one case is identical to the "issue at stake" in another, a court must first determine what that issue is.

Google badly misstates the "issue at stake" in *Apple*, which dooms its preclusion argument.  Google asserts that "the *Apple* court held that Google and Apple compete in the same product market" and contends that Epic should not have been permitted to relitigate that "issue" here.  (Br.32.)  That is a mischaracterization of *Apple*, founded on the mistaken premise that courts define antitrust markets in the abstract, without reference to the conduct they are analyzing.  That is not so:  "what the appropriate product market is depends on what anticompetitive harm is being claimed."  *Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 616 (N.D. Cal. 2020).  As Judge Boudin put it, "the nature of the claim can affect the proper market definition".  *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 598 (1st Cir. 1993); *see also id.* ("[R]ational treatment is assisted by remembering to ask, in defining the market, *why* we are doing so: that is, what is the antitrust question in this case that market definition aims to answer?").

Google's error is known in the antitrust literature as "the independent market fallacy:  the belief that relevant antitrust markets exist independent of underlying

theories of harm". David Glasner & Sean P. Sullivan, *The Logic of Market Definition*, 83 Antitrust L.J. 293, 298 (2020). "As purely analytical constructs, markets do not exist independent of a problem or inquiry but must be defined in terms of a problem or inquiry." *Id.*; *see also* 2B Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 531 (5th ed. 2021) ("Finding the relevant market and its structure is typically not a goal in itself but a mechanism for considering the plausibility of antitrust claims that the defendants' business conduct will create, enlarge, or prolong market power."); Phillip Areeda, *Market Definition and Horizontal Restraints*, 52 Antitrust L.J. 553, 553 (1983) ("Market definition is only a means to an end. In the law school classroom, I am repeatedly disappointed that my students leap into market definition without first specifying the particular legal question that the tribunal hopes to answer through market definition.").

Google claims that defining a market for the purpose of analyzing a specific set of conduct "puts the cart before the horse" (Br.37), but its own amicus disagrees: "Assuring that markets are suitable for the purposes to which they are put requires that a preliminary step be taken before market delineation. This step is the identification of who might exercise market power, against whom it might be

exercised, and how it might be exercised."  Gregory J. Werden, *Four Suggestions on Market Delineation*, 37 Antitrust Bull. 107, 108 (1992).[7]

Consistent with these principles, the courts in *Apple* did not identify a freestanding product market applicable to any and all cases involving app stores, because that was not the "issue" before them.  They instead decided "the relevant market *for Epic's antitrust claims*", *Apple II*, 67 F.4th at 981 (emphasis added), meaning the relevant market for assessing the competitive effects of *Apple*'s conduct—its vertical integration of hardware, operating system and app store—which was the conduct at issue there.  The product market that is "relevant" to assessing the competitive effects of the very different conduct engaged in by a different defendant (Google) is not an "identical" issue.

Google's passing suggestion that its conduct is not different from Apple's (Br.38) does not bear scrutiny.  For example, only Google licenses an operating system to OEMs and uses its license agreements to obstruct competing app stores, and only Google has paid OEMs and developers to prevent them from competing. (SOC III.A)  Assessing the competitive effects of those restrictive agreements

---

[7] Indeed, Google's market definition expert in this case testified that she "started [her] market definition process by focusing on what [she] called the focal product, which in this case was the focal product of Epic's allegations, Google Play". 6-SER-1122.

requires defining a market tailored to that conduct. Identifying such a market was not the "issue at stake" in the *Apple* litigation, where the courts had to define a market tailored to the very different conduct in which Apple engaged, *i.e.*, maintaining its walled garden.

Contrary to Google's contention, the factors listed in *Howard v. City of Coos Bay*, 871 F.3d 1032, 1041 (9th Cir. 2017), support this conclusion. Although the "rule of law" (second factor) is the same in both cases, the remaining factors point the other way—as shown by Google's own conduct. The district rules require a party that believes cases are "related" (fourth factor) to file a motion alerting the court, so that they can be adjudicated together if appropriate, N.D. Cal. Civ. R. 3-12(b). Yet Google never filed such a motion (nor did Apple). Moreover, Google proposed an entirely different market from what Apple proposed or what the courts in the *Apple* litigation used (SOC III.B.), making for different "evidence or argument" (first factor) and different "pretrial preparation and discovery" (third factor), including the extensive expert program on market definition.

This lack of identity is a sufficient basis on which to affirm the district court. A separate flaw in Google's preclusion argument is its contention that the market definition in *Apple* "conflict[s]" with the markets found by the jury. (Br.38.) It does not. Different antitrust cases can have distinct and overlapping market definitions. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) ("[W]ithin

40

[a] broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes.").  One can be a submarket of the other.  *See id.*; *United States v. Cont'l Can Co.*, 378 U.S. 441, 457-58 (1964) (a broader product market "does not necessarily negative the existence of submarkets"); U.S. Dep't of Justice & Fed. Trade Comm'n, *Merger Guidelines* § 4.3 n.77 (2023) ("Multiple overlapping markets can be appropriately defined relevant markets.").  Indeed, on this basis, this Court has expressly rejected the idea that overlapping markets are "inherently contradictory".  *Olin Corp. v. FTC*, 986 F.2d 1295, 1301 (9th Cir. 1993).

For example, in different cases there could be a market for fast-food restaurants, a market for fast-food burger restaurants, and a market for burger restaurants.  These markets would overlap, but would not "conflict".  And the fact that McDonald's and Taco Bell might be in the same market in a case with conduct affecting fast-food restaurants does not preclude McDonald's from being in a burger restaurant market that omits Taco Bell in a subsequent case.  *See* Hovenkamp, *Federal Antitrust Policy* 115 (6th ed. 2020) (diagram showing overlapping markets for motor vehicles, four-wheel-drive vehicles and diesel-fueled vehicles, all of which could be relevant markets in appropriate cases).  Thus, the overlap between the market found in *Apple* and the markets found by the jury here is not incongruous.

41

### (b)    The Market Definition Finding Was Not Necessary to the Outcome in *Apple*.

Google likewise fails the fourth element of issue preclusion—that the issue be necessary and "essential to the prior judgment". *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008); *see also Chavez v. Dir., OWCP*, 961 F.2d 1409, 1413 ("[i]ssue preclusion[] does not apply where the issue said to give rise to it was not essential to the previous judgment[.]"); Rest. 2d Judgments § 27 & cmt. h (1982) (same).

In *Apple*, the district court and this Court rejected Epic's claims for reasons *independent of* the market definition.  Specifically, on Epic's restraint of trade claim, the district court found that even if Apple had market power, *Apple I*, 559 F. Supp. 3d at 1037, Apple had established procompetitive justifications and Epic failed to rebut that by proving the existence of less restrictive alternatives (LRAs)*, id.* at 1040-41.  The same is true of Epic's monopolization claim, where the court found that Apple was not a monopolist but Epic's claim failed for the independent reason that Apple established procompetitive justifications.  *Id.* at 1044.  On appeal, this Court likewise made clear that regardless of market definition, Epic's claims were doomed because of a failure to rebut Apple's procompetitive justifications.  This Court held that "*even assuming Apple has monopoly power*, Epic failed to prove Apple's conduct was anticompetitive".  *Apple II*, 67 F.4th at 999 (emphasis added); *see also id.* at 990 (affirming on restraint-of-trade claim because Epic failed to prove LRAs), 998 (same for tying claim).

42

These holdings make the *Apple* court's market definition non-essential to the outcome—and specifically not essential to the issue on which Google seeks preclusion, *i.e.*, the degree of Apple's competition with Google.  Regardless of whether the relevant market included Google, Apple's procompetitive justifications would still have carried the day and been the death knell for each of Epic's claims.  Under these circumstances, the market definition adopted in *Apple* was not essential to the judgment.  *See* Rest. 2d Judgments § 27, cmt. h ("If issues are determined but the judgment is not dependent upon the determinations, relitigation of those issues in a subsequent action between the parties is not precluded."); *see also Chavez*, 961 F.2d at 1413 (9th Cir. 1992) (citing Rest. 2d Judgments § 27).  The "essential" determination was the finding that Apple established unrebutted procompetitive justifications for its conduct, which would negate liability even if Apple had monopoly or market power.  Accordingly, Google's issue preclusion defense fails on this additional ground.

Moreover, Google cannot show that the issue it presses—that "Apple and Google compete for app downloads and in-app transactions" (Br.31)—was "necessarily decided" in *Apple*:  on the additional ground this Court expressly declined to reach it on appeal.  "Issue preclusion does not apply to issues we declined to reach on appeal."  *City & Cnty. of San Francisco v. Garland*, 42 F.4th 1078, 1085 n.6 (9th Cir. 2022).  In *Apple II*, this Court affirmed the district court's

43

conclusion that Epic did not prove single-brand aftermarkets because it "failed to show a lack of general consumer awareness regarding Apple's restrictions on iOS distribution and payment processing". 67 F.4th at 980. In light of that conclusion, this Court decided it "need not reach—and d[id] not express any view regarding— the other factual grounds" for the district court's market definition decision. *Id.* Specifically, this Court did not address "switching costs" between Google and Apple or the "empirical evidence and the *Brown Shoe* factors". *Id.* These are the issues necessary to assess whether app distribution and in-app payment solutions on iPhones and Android phones are economic substitutes, as required for market definition, *see*, *e.g.*, *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120-21 (9th Cir. 2018)—and this Court did not decide them. The district court's decision on these issues has no preclusive effect.

### B. The District Court Properly Rejected Google's Proposed "Single-Brand Aftermarket" Instruction.

Epic established that Google engaged in anticompetitive conduct in the Android app distribution and in-app payment solutions markets, which the jury determined under the standard framework for market definition. 2-SER-118; 6-ER-1425-26. Google's assertion that the district court erred by failing to instruct the jury to assess Epic's claims under special market definition rules applicable to "single-brand aftermarkets" (Br.43; *see* 3-SER-211) fails for two reasons.

*First*, Google failed to lay any evidentiary foundation for a single-brand aftermarket instruction, and the district court was therefore well within its discretion to conclude that the instruction would have confused the jury. (Part I.B.1.) *Second*, the instruction would have been inappropriate because the markets Epic proved to the jury are not single-brand aftermarkets. (Part I.B.2.)

## 1. The District Court Properly Rejected Google's Proposed Instruction Due to a Lack of Evidentiary Foundation and the Risk of Jury Confusion.

Google wrongly presents the propriety of the single-brand aftermarket instruction solely as a legal question subject to *de novo* review. (Br.31.) But a jury instruction challenge "presents two questions, one primarily factual, the other purely legal". *United States v. Heredia*, 483 F.3d 913, 921 (9th Cir. 2007). It is a legal question whether a given instruction accurately states the law, but "whether an instruction should be given in the first place depends on the theories and evidence presented at trial", and this "is mostly a factual inquiry". *Id.* This factual determination "requires judgment as to whether the proposed instruction is relevant to the issues presented or would unduly confuse the jury". *Id.* "The district judge's proximity to the trial and intimate knowledge of the record justify considerable deference to his judgment in these situations." *Id.* Thus, such decisions are reviewed for abuse of discretion. *See id.*; *see also Yan Fang Du v. Allstate Ins. Co.,* 697 F.3d 753, 757 (9th Cir. 2012).

Here, the district court found that Google failed to lay a proper evidentiary foundation for its proposed single-brand aftermarket instruction. 1-ER-61. Google mischaracterizes the district court as having relied on the fact that "Epic did not use the words 'foremarket' and 'aftermarket'" at trial. (Br.43.) But the court did not focus on whether particular "magic words" were used (*id*.); it assessed whether the "concept" of single-brand aftermarkets was presented. 1-ER-62. And the court considered not just what *Epic* presented; it observed that *Google* never introduced the concept of single-brand aftermarkets to the jury. 1-ER-61 ("Nobody in this case…has said a word about it, including your own experts…none of your experts…said a peep about a proposed relevant market being based on a for[e]-market and after-market theory"); *see* 1-ER-143 ("It has been a complete absentee presence…. It's not even on the record here."). None of Google's fact or expert witnesses ever mentioned the concept. 1-ER-141-42. Google's market definition expert did not posit that a single-brand aftermarket framework was appropriate. 6-SER-1088-116. And Google did not question either of Epic's economists about the subject.

The district court correctly found that Google's proposed single-brand aftermarket instruction sought to introduce "a concept to the jury that they have not heard a word about until they're alone in the jury room trying to figure out what to do": it was the "quintessential definition of an inappropriate instruction" not

46

grounded in the trial evidence.  1-ER-62; *see also* 1-ER-141-43; 1-ER-61.  *See, e.g., Dedmon v. Staley*, 315 F.3d 948, 950 (11th Cir. 2003); *Hoselton v. Metz Baking Co.*, 48 F.3d 1056, 1063 (8th Cir. 1995).  That alone is sufficient reason to reject Google's claim of error.

### 2.  Google's Proposed Instruction Misstated the Law on Market Definition Applicable to Epic's Claims.

Google's proposed market definition instruction was also inappropriate because the markets in this case are not single-brand aftermarkets.  It is important to distinguish between aftermarkets generally and the narrower concept of "single-brand" aftermarkets.  Ordinary aftermarkets, in which a consumer has already purchased a durable good in a "foremarket", Br. 40, are common.  For instance, shoelaces are an aftermarket for shoes.  These ordinary aftermarkets are governed by "the framework for assessing markets generally".  *Apple II*, 67 F.4th at 976.

In contrast, a "single-brand aftermarket" arises only when an aftermarket depends on the purchase of a durable good from a *single brand*.  For example, in *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992), the aftermarket for Kodak parts and services depended on the buyer first having purchased a Kodak copier.  The law presumes that when consumers buy a defendant's durable good, they "make a knowing choice to restrict their aftermarket options".  *Newcal Indus., Inc. v. IKON Off. Sol.*, 513 F.3d 1038, 1050 (9th Cir. 2008).  In such cases, there is no separate aftermarket; there is a unitary

decision by the consumer to buy the defendant's durable good and accept any restrictions that come with it.  Plaintiffs seeking to establish a separate single-brand aftermarket must therefore show that consumers are unaware of the aftermarket restrictions when they transact with the defendant.  *Apple II*, 67 F.4th at 979.

The single-brand aftermarket framework applies only when the defendant sells the durable product in the foremarket and then also participates in an aftermarket that depends on that product.  The defendant's sale of the durable product is what may allow it to "leverag[e] a special relationship with its [customers] to restrain trade in a wholly derivative aftermarket".  *Newcal*, 513 F.3d at 1050.  That is the structure of the Supreme Court's formative decision in *Kodak*, *supra*, all three of this Court's decisions addressing the issue,[8] and all the other single-brand aftermarket decisions Google cites (Br.41).  No case has applied the special requirements for single-brand aftermarket definition when the consumer does not transact with the defendant in the foremarket.

Epic did not allege single-brand aftermarkets, nor could it have properly done so since the vast majority of Android consumers do not buy a durable good from Google.  Consumers buy Android smartphones from a variety of OEMs, such

---

[8] *Apple II*, 67 F.4th at 966-67; *Newcal*, 513 F.3d at 1043-44; *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997).

as Samsung, Motorola and Sony; Google's share of smartphone sales is very small. *See, e.g.*, 6-SER-1075-76; 5-SER-864-65. Google attempts to elide this point by arguing that the foremarket good is "devices running Android" (Br.42), but most consumers do not obtain "devices running Android" from Google, and indeed do not transact with Google in a "device foremarket" at all (Br. 45). Consumers cannot be presumed to knowingly accept Google's app distribution and in-app payment solution restrictions when they buy "devices running Android" from third-party OEMs. That is particularly so because Google separately transacts with OEMs to license them the Android operating system, and the record shows that different OEMs are subject to different restrictions. 5-ER-1048, 5-SER-866; 5-SER-874-75; 6-SER-1051,1161.

Google's effort to equate this complex multi-party market structure to the single-party structure in *Apple II* fails. (Br.42.) All iOS users must obtain an iPhone from Apple; there are no other iPhone suppliers. Because iOS users purchase an Apple product from Apple, this Court presumed they do so with knowledge of Apple's downstream restrictions—and put the burden on Epic to show otherwise. As such, *Apple II* fit neatly into the *Kodak* paradigm of a durable good from a single supplier and alleged aftermarkets depending on that single brand. In this case, by contrast, Android users buy smartphones from a multiplicity of suppliers (the OEMs), and those suppliers are subject to varying

49

restrictions arising from their separate bilateral contracts with Google. Without a purchase directly from Google, the logic behind requiring a plaintiff to prove a single-brand aftermarket does not apply.

Google's complaint that "it makes no sense that Epic should face an easier burden in proving an antitrust case against Google" than against Apple (Br.45) misses the point. As in any antitrust case, each defendant must be judged on its own conduct and the record presented at trial. For the reasons above, the market definition analyses for iOS and Android are not the same, but that does not necessarily make it easier to "prov[e] an antitrust case against Google." Market definition is just one step in the analysis; it is not the whole case.

Epic needed to demonstrate that Android app distribution and Android in-app payment solutions are proper markets under standard market-definition principles. It did so. 1-ER-53. Among other things, the jury credited Epic's evidence that the high costs to a user of switching from an Android phone to an iPhone render app distribution on iPhones an insufficient constraint on Android app distribution for the two to be in the same market. 5-ER-1058-72; 5-ER-927-932; 5-ER-940-57; 6-SER-1142-44; 7-SER-1228-38; 7-SER-1243-45; 7-ER-1499-1545; 7-ER-1551;7-ER-1596-97; 8-SER-1378-81. Likewise, for app developers, distribution on iPhones is not a substitute for distribution on Android: developers cannot abandon the Android platform, with its hundreds of millions of users,

without jeopardizing their businesses.  *See* 5-SER-780-81; 6-SER-1164-65; 6-SER-1171 ("[I]t is almost like a 101 must do in mobile publishing, you need to be at the very least on Apple and Google in order to succeed[.]").  As the district court observed:  "Epic presented substantial evidence showing that the Android-only product markets made factual and economic sense for the case."  1-ER-31.[9]

Google's argument fails for the further reason that, if there were an error (there was not), Google was not prejudiced.  *See BladeRoom Grp. Ltd. v. Emerson Elec. Co.,* 20 F.4th 1231, 1243 (9th Cir. 2021) (instructional error is harmless if it is "more probable than not that the jury would have reached the same verdict had it been properly instructed").  The trial evidence demonstrated that Google's restrictions on Android app distribution and in-app payment solutions are not "generally known", as required for proving single-brand aftermarkets.  *Apple II*, 67 F.4th at 979 n.10.  Google touts Android as an "open-source operating system" that gives users choices, including as to app distribution.  *See* 5-SER-755; *see also* 5-SER-758; 5-ER-1083-84; 6-ER-1302-04.  But users are not told of Google's anticompetitive agreements like the MADA, RSA 3.0 or Project Hug.  Similarly,

---

[9] Thus, Google's claim that Epic "gerrymandered" the relevant markets to exaggerate its market power (Br.31) is an impermissible re-run of a factual argument it made and lost below.

users are not even aware of what a payment processor is, let alone that their choice of app store would restrict which payment processor they may use.  5-SER-937.

### C. The Jury Instructions Did Not Improperly Preclude Google from Relying on Pro-Competitive Justifications in Other Markets.

Google argues that the judgment should be reversed because, according to Google, "[a]t Step 2 of the Rule of Reason, the District Court improperly limited the jury's consideration of the procompetitive benefits of the challenged conduct to the 'relevant market[s]'" (Br.47).

#### 1. The Instruction on Restraint of Trade Does Not Contain the Restriction Google Challenges.

The district court gave the instruction on procompetitive benefits (Step 2 of the Rule of Reason) that Google complains about *only* as to Epic's monopolization claim, not its restraint of trade claim.  *Compare* 6-ER-1435, *with* 6-ER-1443-44. The instruction on the restraint-of-trade claim does not even arguably limit the scope of the procompetitive justifications the jury could consider.  The jury was instructed to consider "whether Google has proven that the restraints produced countervailing competitive benefits", with no limitation on the market where such benefits occurred.  6-ER-1439-40; *see also* 6-ER-1443 ("you must next determine whether Google has proven that the restraint also benefits competition in other ways").  Accordingly, on Epic's restraint-of-trade claim, Google's assertion that

the court "limited the jury's consideration of procompetitive benefits…to the 'relevant market[s]'" is incorrect.

Indeed, Google did not object to the district court's instruction on Epic's restraint-of-trade claim, 1-ER-108-13 (discussing objections to Instruction 27)), and has not preserved any such objection for appeal. *See Millenkamp v. Davisco Foods Int'l, Inc.*, 562 F.3d 971, 982 (9th Cir. 2009).

### 2. The Court Need Not Assess Legal Error as to the Monopolization Instruction, Because Any Such Error (If It Existed) Would Be Harmless.

As explained below, the instruction Google challenges on the monopolization claim was legally proper. But this Court need not reach that question. The jury's rejection of Google's justifications in connection with Epic's restraint-of-trade claim—where the jury was not restricted from considering out-of-market justifications—shows that even if there were error on the monopolization instruction (there was not), it would have been harmless. *See BladeRoom*, 20 F.4th at 1243. The jury considered—and rejected as insufficient—the full range of justifications that Google offered.

At trial, Google relied heavily on evidence and argument that its conduct purportedly enhanced Google's ability to compete with Apple. *See, e.g.*, 5-ER-1107-09; 5-ER-1121-22; 5-ER-1144; 6-SER-1139; 6-ER-1281. The district court did not restrict Google from presenting that evidence or making that argument.

(SOC V.)  The jury was then indisputably free to consider *all* of Google's asserted procompetitive justifications when assessing Epic's restraint-of-trade claim; and having done so, the jury found for Epic on that claim.  There is no basis to believe that, after finding Google's out-of-market justifications insufficient to defeat Epic's restraint-of-trade claim, the jury would have considered them sufficient to defeat the monopolization claim.  *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020) (rule-of-reason analysis "essentially the same" for the two claims). The two claims pertained to the same conduct, resulting in the same competitive harms.  And Google asserted precisely the same procompetitive justifications as to each—*never once drawing any distinction between the two at trial*.  It is "more probable than not that the jury would have reached the same verdict" even if the monopolization instruction on Step 2 had read the way Google contends it should have read.  *BladeRoom*, 20 F.4th at 1243.

This also demonstrates the artificiality of Google's effort to fixate on a few words in one jury instruction on one cause of action as purportedly preventing the jury from considering a primary defense Google presented at trial.  Jury instructions are reviewed "as a whole".  *Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1065 (9th Cir. 2020) (en banc).  The district court placed no limits on Google's ability to present the procompetitive justification evidence and argument that Google desired—and Google took full advantage of that opportunity.  1-ER-

34.  And the court repeatedly instructed the jury to consider Google's procompetitive justifications, using a variety of verbal formulations, without any restriction on their scope.  6-ER-1414; 6-ER-1435; 6-ER-1438-39.  The jury would not reasonably have taken the one reference to "consumers in the relevant market" to preclude Google's defense based on furthering competition with Apple, and even if that were error (which it was not), the jury instructions as a whole accurately conveyed to the jury the task it was supposed to undertake.

### 3.  The Instruction Limiting Procompetitive Benefits to the Relevant Markets Was Proper as a Matter of Law.

In any event, the district court did not err in instructing the jury to consider procompetitive justifications "for consumers in th[e] relevant market" in Step 2 of the analysis of Epic's monopolization claim.  No Supreme Court case has ever affirmatively endorsed—much less required—the consideration of procompetitive justifications occurring in markets other than the ones in which anticompetitive harms were proven.  Nor has any Supreme Court case accepted such cross-market benefits as a basis for defeating antitrust liability.  On the contrary, such cross-market justifications were resoundingly rejected in *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 370 (1963).  Google brushes that decision aside as limited to Section 7 of the Clayton Act, but does not cite a single case endorsing that distinction.  Cross-market justifications were also viewed unfavorably in *United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972), a Sherman Act case,

55

where the Supreme Court lamented the "inability [of courts] to weigh, in any meaningful sense, destruction of competition in one sector of the economy against promotion of competition in another sector." *Id.* at 609-10. Google ignores *Topco* in its appeal brief. It argued below that *Topco* "merely explains the logic" of *per se* cases, 4-ER-838, but the issue the Court identified in *Topco* is just as problematic in Rule of Reason cases.[10] And finally, Google suggests *Apple II* "added nothing" to what Google claims is a clear rule endorsing cross-market justifications. But this Court expressly concluded in *Apple II* that "[t]he Supreme Court's precedent on this issue is not clear," citing cases going both ways, and found that "[o]ur court's precedent is similar." 67 F.4th at 989.

Contrary to Google's assertions, therefore, there is nothing "confounding" (Br.50) in the district court's conclusion that "there [is] no legal mandate to expressly require the jury to consider cross market justifications". 1-ER-34. Indeed, both below and in its brief here, Google has not cited a single Supreme Court or Ninth Circuit case *requiring* consideration of cross-market justifications at Step 2 of the Rule of Reason. At most, Google identifies cases where it claims

---

[10] *See also PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 417 (5th Cir. 2010) (stating that under Step 2 of the Rule of Reason, "[w]e balance the 'anticompetitive evils of a restrictive practice ... against any procompetitive benefits or justifications *within the confines of the relevant market*.'" (emphasis added)).

courts impliedly agreed to *consider* them—and typically rejected them out of hand as insufficient to overcome liability.

For example, in *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85 (1984), the Court considered cross-market justifications only in the sense that it rejected them as not in fact procompetitive. The Court never assessed whether they could be cognizable, had they been procompetitive, even though they arose outside the relevant market. The only other Supreme Court case Google cites, *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007), is entirely inapposite; it does not involve a Rule of Reason analysis at all and, moreover, addresses intrabrand and interbrand competition that occurred *in the very same market*. *See id.* at 881-84.

### 4. Google Did Not Lay an Evidentiary Foundation for an Instruction on Cross-Market Justifications.

Even if Google could point to courts that found it appropriate to consider cross-market justifications, an instruction cannot be required unless the defendant laid an appropriate evidentiary foundation for the existence of well-defined procompetitive effects in some alternative market. *See Yan Fang Du,* 697 F.3d at 757 (explaining that to justify giving a particular jury instruction, "there must be a sufficient evidentiary foundation to support giving the instruction"). Here, Google utterly failed to lay an evidentiary foundation that would allow the jury to consider such justifications.

57

*First,* Google presented no evidence of how the jury could find anticompetitive effects at Step 1 but then find a benefit to competition with Apple in Step 2. Epic's claim at Step 1, which the jury accepted, was that Google's conduct harms Android consumers and developers, thus making Android less desirable for these two constituencies than it would otherwise be.[11] At no point during trial did Google present evidence or suggest a mechanism by which Google's restrictions could make Android *less* desirable for Android consumers and developers (as the jury undisputedly found) and yet somehow make Android *more* competitive vis-à-vis Apple. Nor has Google addressed this fundamental illogic on appeal.

*Second*, Google failed to lay a foundation for its requested instruction because it never defined any other market in which procompetitive benefits supposedly could arise. Google claims that "the driving principle behind the Rule of Reason analysis is to determine the competitive effects of the restraint" and that the district court barred "important effects … from consideration". (Br. 49.) But competitive effects do not occur in a vacuum and "cannot be evaluated unless the

---

[11] Epic's economist specifically explained to the jury why Google is *not* incentivized to maximize the overall size of the Android pie, as long as Google can extract for itself a larger slice (*i.e.*, more profit) from its anticompetitive conduct in the relevant markets. 6-SER-1043-45.

Court first defines the relevant market." *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 n.7 (2018). That is true not just for *anti*competitive effects, but also for *pro*competitive effects. For example, new entry into a monopolized market would result in significant procompetitive benefits, while new entry into a highly fragmented market might not. Thus, if courts and juries were allowed (or even required) to consider procompetitive effects in a market other than the one where harms occur, they could not evaluate those effects without evidence of the market in which the effects arise and the competitive conditions therein.

Here, Google provided no such evidence. Google placed all its market definition eggs in the basket of its asserted market for the "facilitation of digital content transactions". 6-SER-1121. Its expert described that market as the market for "making sure that downloading an app, purchasing content in an app, and consuming content in an app are all going well." 6-SER-1122. Google never presented the jury with an alternative market—one that would coexist with and relate to the app distribution and payment solutions markets the jury found. Accordingly, the district court was fully justified in declining Google's invitation to require the jury to assess procompetitive effects in some undefined market Google never told the jury about. *See, e.g., United States v. Heredia,* 483 F.3d 913, 921 (9th Cir. 2007) ("whether an instruction should be given in the first place

… requires judgment as to whether the proposed instruction is relevant to the issues presented or would unduly confuse the jury").

### D. The District Court Properly Conducted a Jury Trial.

This case was properly tried to a jury based on Google's express and implied consent. Fed. R. Civ. P. 39(c). The district court properly rejected Google's last-minute attempt to withdraw that consent. Further, neither Google nor its amicus on this issue, Ninth. Cir. Dkt. 60.2, cites a single precedent vacating a judgment because a district court conducted a jury trial rather than a bench trial.

To be sure, Google *claims* to have identified such a case (Br.54-55 (citing *Dunmore v. United States*, 358 F.3d 1107 (9th Cir. 2004)), but that claim is simply wrong. Google accurately states that the plaintiff in *Dunmore* "demanded a jury trial in district court" and then stipulated to a transfer to bankruptcy court. (Br.54-55.) Google's recitation then goes wildly awry, claiming that the "plaintiff refused to consent to a jury trial in bankruptcy, but the court held one anyway". (*Id.*) Google further claims that "[t]his Court reversed" because the bankruptcy court jury trial took place without the plaintiff's consent. (*Id.*)

Not so. In fact, there was *no* trial in *Dunmore* *at all*. The bankruptcy court scheduled a bench trial, and the plaintiff sought a transfer back to district court to obtain the jury trial he had demanded. *Dunmore*, 358 F.3d at 1111, 1116. The bankruptcy court refused the transfer and then dismissed the case for failure to

prosecute when the plaintiff was unprepared to proceed in "a bench trial…he did not want". *Id.* at 1110-11, 1116-17. This Court reversed, not because the court erroneously *held* a jury trial, but because the court wrongly *deprived* the plaintiff of a jury trial to which he was entitled. *Id.* at 1116-17. *Dunmore* is of no help to Google.

Google's other arguments should be rejected.

*First*, Google wrongly implies that review on this issue is *de novo*. (Br.52.) But the case it cites, *SEC v. Jensen*, 835 F.3d 1100, 1106 (9th Cir. 2016), addressed whether the Seventh Amendment entitled a party to a jury as a matter of law. 835 F.3d at 1106. Whether a party consented to a jury under Rule 39(c) is a different issue, which is reviewed for abuse of discretion. *See Tomlinson Black N. Idaho v. Kirk-Hughes*, 361 Fed. App'x 712 (9th Cir. 2009) (unpublished memorandum); *Hildebrand v. Bd. of Trs. of Michigan State Univ.*, 607 F.2d 705, 711 (6th Cir. 1979).

The district court correctly found that Google repeatedly consented to a jury, both expressly and implicitly. 1-ER-149-50. *See Broadnax v. City of New Haven*, 415 F.3d 265, 271-72 (2d Cir. 2005); *Pals v. Schepel Buick & GMC Truck, Inc.*, 220 F.3d 495, 501 (7th Cir. 2000) ("implied consent is as good as express consent"). For example, in opposition to a motion to bifurcate Epic's claims from other plaintiffs' claims, "Google called for a single jury trial on plaintiffs' antitrust

claims", and the district court resolved that motion in Google's favor. 1-ER-149. In a joint submission ordered by the court for trial planning, Google agreed that "all claims by all Plaintiffs are triable to a jury", with the exception of certain state-law claims not at issue here. 1-ER-149-50. "On the basis of these and other representations manifesting Google's embrace of a jury trial on all claims in the case, the Court issued a number of case management and scheduling orders contemplating a jury trial on Epic's claims, which Google never objected to." 1-ER-150. The district court was well within its discretion to try Epic's claims to a jury.[12]

Second, Google argues that Epic's claims were "consolidated" with the claims of other plaintiffs, and Google therefore "condition[ed]" its consent on those other plaintiffs' participation in the trial. (Br.53-54.) Google's premise is false. Epic's claims were not consolidated with the other Plaintiffs' claims for trial. Consistent with 28 U.S.C. § 1407(a), the Judicial Panel on Multidistrict Litigation transferred cases to the district court "for coordinated or consolidated

---

[12] Google refers to the bench trial in *Epic v. Apple.* (Br.53.) *Apple* was tried to the bench because the parties agreed to a bench trial. Joint Statement (ECF No. 105), *Epic Games v. Apple*, No. 20-cv-5640 (N.D. Cal. Sept. 29, 2020). Here, the parties agreed to a jury. In both cases, the parties got exactly what they agreed.

*pretrial* proceedings". 4-ER-955 (emphasis added). The district court then *denied* consolidation of Epic's case with the other plaintiffs' cases. 4-SER-678.

Google's statement that "the District Court subsequently ordered that a single trial would take place for all claims in the MDL" (Br.53) is also wrong. The district court determined that a single *jury* trial would take place before any necessary bench proceedings, and it ordered the parties to present a plan for those proceedings. 4-SER-561. In response, Google expressly consented to a single jury trial of "all claims by all Plaintiffs". 4-ER-902. Google could have sought to segregate Epic's claims for a bench proceeding, but instead it agreed to a jury trial including Epic's claims. 1-ER-149.

Google inaccurately claims that this express consent was "conditional" because the plan applied "*if [the jury trial] includes* Epic, the [developer] Plaintiffs, the States, and the individual consumer plaintiffs". (Br.54.) But Google's "if" is out of context. The uncertainty was whether the planned jury trial should include the States and consumer plaintiffs, whose ability to try their claims on a class-wide basis (or as *parens patriae*) was still being determined. 4-SER-547-48. There was no question (and Google expressly agreed) that the jury trial would include at least Epic and Match, even if the States and consumers had to be removed. 4-SER-544-45.

Google claims that, three weeks before trial, it warned that "if Match settled its damages claims, Epic's antitrust claims would be tried in a bench trial". (Br.54.) But Google actually said in the Joint Pretrial Statement that, in that event, "the parties *may need to revisit* the question of which claims and defenses will be tried to a jury". 4-SER-505 (emphasis added). Thus, even weeks before trial, Google still did not say that it would revoke its consent to a jury upon settling with Match, just that it *might* want to try to change its mind.

*Third*, Google argues that the district court "should have honored" its attempt to withdraw consent. (Br.55.) But that attempt came "just one day before jury selection and two court days before the start of trial". 1-ER-150. The district court was well within its discretion to decline. *See Tomlinson*, 361 F. App'x at 712 ("[Defendant] consented to trial by jury, and the district court did not abuse its discretion in rejecting her last-minute change of heart.").

Contrary to Google's and its amicus's claims, the district court did not rely on the "timing of the withdrawal standing alone". (Br.55; Ninth Cir. Dkt. 60.2 at 19.) Rather, the district court found that Epic had "expended substantial time and resources preparing for a jury trial". 1-ER-150. By the time of Google's about-face, Epic had prepared its opening statements, experts, witnesses and other evidentiary presentations for a jury trial. 4-ER-841. Both Epic and the court had expended substantial resources—including two hearings—determining the

64

appropriate remedy for Google's intentional destruction of evidence in the context of a jury trial. 4-SER-634-35; 4-SER-618-29.

Google's argument that no "additional work" would have been required by switching to a bench trial (Br.57) is patently wrong. Because of the differences between presenting a case to a jury versus a judge, Epic would have had to rework its evidentiary presentations , just a few days before trial. The resulting prejudice is obvious. *See Hildebrand*, 607 F.2d at 710 ("Any good trial lawyer will testify that there are significant tactical differences in presenting and arguing a case to a jury as opposed to a judge. To convert a trial from a jury trial to a bench trial (or vice versa) in the middle of the proceedings is to interfere with counsel's presentation of their case and, quite possibly, to prejudice one side or the other."); *see also Pradier v. Elespuru,* 641 F.2d 808, 811 (9th Cir. 1981) ("There are frequently significant tactical differences in presenting a case to a court, as opposed to a jury."). The district court committed no error in determining that a late-stage withdrawal would "gravely prejudice" Epic. 1-ER-150.

The district court also found that withdrawal "would undermine the considerable case management work the Court undertook in anticipation of a jury trial". 1-ER-150. For example, because of Epic's right to a jury trial on Google's counterclaims, 2-SER-156, withdrawal would have required the district court to schedule, at the last minute, *two* trials involving overlapping witnesses and

65

evidence. 1-ER-149. The district court was well within its discretion to reject Google's attempt to disrupt its trial planning. Federal Rule of Civil Procedure 16(e) expressly bars such changes after a final pretrial conference except to prevent "manifest injustice", which Google did not even attempt to show. *See Thompson v. Parkes*, 963 F.2d 885, 889 (6th Cir. 1992).[13]

*Fourth*, Google's claim that it was prejudiced by a jury trial is wrong. (Br.57.) Google had no legal right to a bench trial. *See Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510 (1959) ("[T]he right to jury trial is a constitutional one, … while no similar requirement protects trials by the court"). Any error in trying the case to a jury would thus be harmless. *See United Press Ass'n v. Charles*, 245 F.2d 21, 26 (9th Cir. 1957); Fed. R. Civ. P. 61. Google claims prejudice because the verdict "lacked specific findings of fact" to support the court's injunction. (Br.57.) Even if that were correct (and it is not, *infra* II.D), prejudice would not result from having a jury decide *liability*. As in any matter

---

[13] Google's cases affirming decisions to allow the withdrawal of consent to a jury shortly before trial (Br.55-56) are doubly distinguishable. *First*, the courts there found no prejudice from the withdrawal. *See FN Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071, 1089 (11th Cir. 2016) (withdrawal allowed where "no prejudice will result"); *Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 968 (7th Cir. 2004) ("Kramer has provided no reason why she was prejudiced"). *Second*, these were decisions to *allow* withdrawal. Google has no case finding the denial of withdrawal to be an abuse of discretion.

tried to a jury, it is up to the district court to ensure that any injunction is properly supported (as the court plainly did here, *see infra* II.D).

*Finally*, this Court may affirm on the alternative ground that the Seventh Amendment entitled Epic to a jury trial. There is no dispute that Google's monetary counterclaims were jury-triable. 4-ER-850. Epic's defense was that its contract with Google was illegal under the antitrust laws. 4-SER-666. The district court could not have resolved Google's counterclaims without submitting that defense to the jury as well. *See Jazzabi v. Allstate Ins. Co.*, 278 F.3d 979, 982-83 (9th Cir. 2002) ("requiring civil juries to come to unanimous agreement regarding affirmative defenses … is consistent with the Seventh Amendment"). And because, as Google conceded, the facts underlying Google's counterclaims "overlap in substantial measure" with Epic's antitrust claims, 1-ER-149, the Seventh Amendment required those overlapping issues to be decided by the jury. *See Jensen*, 835 F.3d at 1111-12 ("the right to a jury trial exists only for legal and not equitable claims, but the jury serves as the finder of fact for issues common to both claims"); *see also Beacon Theatres*, 359 U.S. at 508.

### E. Google Erroneously Argues that the UCL Claim Follows the Antitrust Verdict.

Google's argument that the UCL claim rises or falls with the antitrust verdict (Br.58) is "foreclosed by California law". *Apple II*, 67 F.4th at 1001. In *Apple II*,

this Court affirmed that Apple violated the UCL while also affirming that Epic had not proved a Sherman Act violation. *Id*. at 1000.

If this Court reverses or vacates the Sherman Act judgment, it should remand the UCL claim to permit the district court to determine whether, as in *Apple*, Epic proved a violation of the UCL.

## II.    The District Court Did Not Abuse Its Discretion in Crafting the Injunction.

Google's objections to the district court's injunction have no merit.  Once antitrust liability is proven, district courts have broad discretion to eliminate anticompetitive conduct, remedy its lingering effects, and prevent its recurrence. *See*, *e.g.*, *Ford Motor Co. v. United States*, 405 U.S. 562, 573 n.8 (1972); *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947).  Courts must not only "'terminate the illegal monopoly'" but also "'deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future'".  *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 486 (9th Cir. 2021) (quoting *Microsoft*, 253 F.3d at 103).

Because district judges directly observe the evidence on market realities and thus are best positioned to assess those facts, they are "clothed with 'large discretion' to fit the decree to the special needs to the individual case".  *Ford*, 405 U.S. at 573 (quoting *Int'l Salt*, 332 U.S. at 401).  Such injunctions are reviewed for abuse of discretion.  *Optronic*, 20 F.4th at 485.  The "reviewing court only asks

68

if 'the relief [is] a reasonable method of eliminating the consequences of the illegal conduct'". *Optronic*, 20 F.4th at 486 (quoting *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 698 (1978)). And "all doubts as to the remedy are to be resolved in [the successful antitrust plaintiff's] favor." *Ford*, 405 U.S. at 575 (quoting *United States v. E.I. DuPont de Nemours & Co.*, 366 U.S. 316, 334 (1961)).[14]

Based on the record at trial and the subsequent injunctive proceedings, the district court acted well within its discretion in crafting a remedy for Google's anticompetitive conduct.

## A. The District Court Was Within Its Discretion to Adopt the Catalog-Access and Store-Distribution Remedies.

As noted, the district court's injunction has two distinct parts. The first part prohibits Google from engaging in conduct that the jury found illegal and comparable conduct targeted to the same anticompetitive ends. 1-ER-3-4. The

---

[14] Google wrongly relies on *Klein v. City of San Clemente*, 584 F.3d 1196, 1200 (9th Cir. 2009), to argue that this Court should review *de novo* whether the injunction "relie[s] on an erroneous legal premise". (Br.58.) In *Klein*, the district court *denied* a preliminary injunction because the plaintiff did not show a sufficient likelihood of success on the merits, and this Court reversed because the district court's assessment of the merits was erroneous. 584 F.3d at 1201. *Klein* said nothing about the standard of review that applies to an injunction issued to remedy an adjudicated violation of law.

second part, slated to go into effect eight months after issuance, contains two remedies intended to address the ongoing competition-suppressing effects of Google's past unlawful conduct.

*First*, the "catalog access" remedy addresses the "chicken and egg" problem that, because of Google's misconduct, has made it difficult for Google Play's rivals to gain scale. The remedy temporarily gives rivals access to a critical mass of apps to be able to attract users. 1-ER-4-5. *Second*, the "store distribution" remedy addresses the fact that, because of Google's misconduct, very few consumers even look for apps outside Google Play. The remedy requires Google to distribute other app stores on Google Play, so that users have a reasonable chance of finding them. 1-ER-4-5; *see also* 1-ER-16-18. Each remedy sunsets three years after it becomes effective. 1-ER-5; 1-ER-15-18.

### 1. The Injunction Does Not Impose an Impermissible "Duty to Deal".

The jury found that Google violated the law. To remedy that violation, the district must not only stop the unlawful conduct, but also deny Google the ongoing "fruits of its statutory violation". *Optronic*, 20 F.4th at 486. To do so, the court "may order an injunction 'beyond a simple proscription against the precise conduct

previously pursued.'" *Id.* (quoting *Pro. Eng'rs*, 435 U.S. at 698). Google does not dispute those basic concepts.

Instead, Google argues that the catalog-access and store-distribution remedies are beyond the court's power because they impose on Google a "duty to deal" with its rivals. (Br.59 (citing *Verizon Comm'cns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004)).) This argument conflates the standards for liability with the scope of available remedies. *Trinko* and the other cases Google cites address limits on the extent to which refusing to deal with rivals can expose a firm to *liability*.[15] None of those cases holds that imposing a duty to deal is off limits as a *remedy* for an adjudicated antitrust violation.[16]

To the contrary, courts have often imposed such remedies. In *Optronic*, this Court affirmed an injunction requiring the defendant to supply its rival on non-discriminatory terms as part of the remedy for attempted monopolization. 20 F.4th

---

[15] *See* Br.60-64 (citing *Pac. Bell Tel. Co. v. linkLine Commc'ns Inc.*, 555 U.S. 438 (2009); *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013); *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124 (9th Cir. 2004)). Google's assertion that *Novell* "condemned remedies" imposing a duty to deal (Br.60) is wrong; it too was a liability case.

[16] The district court understood the difference. It granted summary judgment to Google on this issue and instructed the jury that it could not consider Google's refusal to distribute rival app stores on Google Play as a basis for liability. 1-ER-156-57; 6-ER-1436-37.

at 486.  The Court rejected the argument that this imposed a remedy for a

dismissed refusal-to-deal claim, holding that a duty to deal may be imposed as part

of a remedy for the defendant's other violations.  *Id.*

*Optronic* did not break new ground.  For example, in *Massachusetts v.*

*Microsoft Corp.*, the D.C. Circuit upheld an injunction requiring Microsoft to

disclose certain proprietary information to rivals even though the "non-disclosure

of this proprietary information had played no role in [the court's] holding

Microsoft violated the antitrust laws".  373 F.3d 1199, 1215 (D.C. Cir. 2004); *see*

*also Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1226 (9th Cir.

1997) ("the district court had ample authority for ordering forced sale or licensing

of patented or copyrighted products"); *United States v. Glaxo Grp. Ltd.*, 410 U.S.

52, 62 (1973) (requiring mandatory sales of product and licensing of patents to

competitors).[17]

Another example is the Supreme Court's decision in *Ford*, where the Court

upheld an order requiring the defendant not only to divest an unlawfully acquired

firm but also to purchase half of its spark plugs from the newly independent

competitor for five years.  405 U.S. at 571-72.  While this obligation exceeded

---

[17] Google's effort to distinguish *Glaxo* and *Kodak* as involving only "compulsory
licensing" (Br.63) is incorrect.  Both injunctions also required the sale of products
to competitors.  *Glaxo*, 410 U.S. at 62-64; *Kodak*, 125 F.3d at 1226.

"return[ing] the market to the *status quo ante*", the Court found it appropriate to provide the competitor with an "assured customer while it struggles to be re-established as an effective, independent competitor". *Id.* at 577, 590. Even though the district court relied on *Ford* to support its injunction, 1-ER-11,12,20, Google ignores it entirely.

Despite these cases, Google argues that its objections to duty-to-deal remedies "track the precise concerns" that animate the limits on duty-to-deal liability, such as avoiding a court acting as a "central planner". (Br.62.) To be sure, certain "[s]imilar considerations" should be taken into account when fashioning a remedy (Br.63 (quoting *NCAA v. Alston*, 594 U.S. 69, 102 (2021))), but neither *Trinko* nor *Alston*—nor any other case—holds that antitrust remedies may not include a duty to deal. Here, the district court respected the remedial "considerations" identified in *Alston* and crafted a "reasonable method of remedying the harm" caused by Google's violations of law. *Optronic*, 20 F.4th at 486.

Google's assertion that *Optronic* is distinguishable because it involved an order "to sell existing products" rather than "design new products and services" is both legally unfounded and factually inapt. Nowhere in *Optronic* did this Court draw such a distinction, and Google once again turns to a liability case, not a

remedy case, to assert that the distinction matters. (Br.63-64 (citing *MetroNet*, 383 F.3d at 1133).)

Moreover, the injunction does not require Google to design new products; it requires Google to make existing resources available so that other firms are not stymied by the continuing effects of Google's wrongdoing. For the catalog-access remedy, the record showed that Google can make its app catalog accessible to rivals by adapting existing tools, such as its metadata server and "Alley Oop" process, at a cost under $1 million. 2-SER-24-26, 29. Google disputed the cost but conceded the modifications were feasible. 2-ER-239 ("I think there is a lot of agreement in this space.") For the store-distribution remedy, Google can use its existing app distribution infrastructure. App stores are themselves just a type of app. Google disallows them as a matter of commercial policy, not technical feasibility. 2-ER-286-87; *see also* 2-ER-226. The remedy simply requires Google to allow the distribution of app-store apps along with the millions of other apps on Google Play. 2-SER-38-39. Google's own witness acknowledged that enabling developers to identify their app as an app store would involve a "de minimis technical change". *Id.*

The district court recognized that there could be some implementation details to address, as there often are in forward-looking injunctions. *See, e.g.*, *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1087 (9th Cir. 2004);

*Hornbeck Offshore Servs., L.L.C. v. Salazar*, 730 F.3d 402, 404 (5th Cir. 2013)

("In drafting an injunction, a district court need not anticipate every action to be

taken in response to [that] order, nor spell out in detail the means in which its order

must be effectuated."). But the record showed that "there is at least at the

conceptual level … some agreement" on how to implement catalog access and app

store distribution. 2-ER-225-26. Further, this is not a "highly detailed decree"

requiring the court to be a "day-to-day enforcer". *Alston*, 594 U.S. at 102. As the

district court observed, the order is "plainly worded and largely self-executing".

1-ER-22. To facilitate the resolution of any implementation details that remain,

the district court established a three-person technical committee, akin to a special

master, which the court can "adequately and reasonably supervise". *Alston*, 594

U.S. at 103. This practical mechanism appropriately balances "a healthy respect

for the practical limits of judicial administration*", id.* at 102, with the need to

ensure that Google's adjudicated violations of law are adequately remedied.

Where there is unlawful conduct, there must be a remedy. In antitrust cases,

that includes ensuring the defendant does not continue to enjoy the unlawfully

obtained benefits of reduced competition. *Optronic*, 20 F.4th at 488. The district

court has "large discretion" in achieving that goal. *Ford*, 405 U.S. at 573. As

shown above, imposing a duty to deal to address the ongoing effects of a

defendant's misconduct is one of the tools a court may employ. Google's assertion

that *Trinko* declared problems that require imposing a duty to deal "irremedia[ble] by antitrust law" (Br.60) is both legally wrong and deeply revealing. It is wrong because the Court made that statement in the context of a duty to deal imposed by a detailed statutory scheme overseen by a regulatory agency (the FCC, under the Telecommunications Act of 1996), and held that antitrust law should not impose additional remedies for "violations of regulatory sharing requirements". *Trinko*, 540 U.S. at 415. There is no comparable regulatory regime here. Google's assertion is deeply revealing because it shows what Google is really after: impunity that would allow it to keep the benefits of its wrongdoing and continue the suppression of competition. That is antithetical to both antitrust remedies and basic principles of equity.

## 2. Google's Causation Argument Fails.

Google's contention that the catalog-access and store-distribution remedies have an insufficient "causal connection to the anticompetitive conduct" (Br.64 (formatting omitted)) is without merit. Google does not dispute that, as its own documents show, Google Play "benefits from networks effects". 1-ER-16 (quoting 5-SER-884). As Google put it, "Users come to Play because we have by far the most compelling catalog of apps/games" and "Developers come to Play because that's where the users are." 1-ER-16 (quoting 5-SER-884-85). Even a "corporate behemoth like Amazon could not compete with the Google Play store due to

network effects." 1-ER-16. In Google's words: "Users won't go to Amazon because their catalog of apps/games is very limited", and "Developers won't focus on Amazon because they don't have users". 1-ER-16 (quoting 5-SER-885).

The district court adopted the catalog-access and store-distribution remedies to address these ongoing network effects. 1-ER-16; 1-ER-18 (catalog-access remedy needed "so that rival app stores have a fighting chance of getting off the ground despite network effects"); *id.* (store-distribution remedy addresses the user side of the network effects problem by "lower[ing] the barriers for rival app stores to get onto users' phones").

Google nevertheless argues that the district court failed to find that these network effects were caused by Google's anticompetitive conduct, as opposed to Google's supposedly lawful "early mover advantage". (Br.66.) This argument fundamentally misunderstands the violations of law the jury found, including that Google unlawfully restrained trade and *maintained* its monopoly. Even if Google had initially acquired some degree of beneficial network effects through an early mover advantage, its unlawful conduct fended off competition that would have eroded its position. As the district court explained, the jury verdict establishes that "Google unfairly enhanced its network effects in a way that would not have happened but for its anticompetitive conduct". 1-ER-17; *see also id.* (finding that even if "Google may legitimately claim some early mover advantage, it was not

77

entitled to *maintain* and *magnify* network effects, and thereby entrench its dominant position" (emphasis added)).)[18]

Contrary to Google's suggestion (Br.65), the district court was not required to try to parse out what degree of network effects was attributable to "early mover advantage" as opposed to subsequent anticompetitive conduct. When a jury finds monopolization, "the available injunctive relief is broad" and need only constitute a "reasonable method of eliminating the consequences of the illegal conduct." *Optronic*, 20 F.4th at 486. The benefit of the doubt on remedy goes to the plaintiff, not the adjudicated wrongdoer. *Ford*, 405 U.S. at 575. Here, given that Google's unlawful conduct suppressed competition for many years, any lawfully obtained network effects from the prior decade can no longer be disentangled from the market structure that Google illegally preserved.

---

[18] The district court backed this up with record evidence, *i.e.*, Google's assessment of Amazon's efforts to compete in Android app distribution. 1-ER-18. Contrary to Google's criticism of that evidence (Br.66-67), the document shows Google's *ongoing* efforts to prevent others from gaining scale, so as to maintain its monopoly position. 7-SER-1271 ("Once they have their own critical mass of users and developers, they'll also benefit from network effects. *At that point*, *it'll become much harder for us to compete.*" (emphasis added)).

### B. The Injunction Does Not Engage in Prohibited "Price Regulation".

Google's challenge to an aspect of the store-distribution remedy as impermissible "price regulation" (Br.68) is without merit. To put this in proper context, Google is complaining about part of a provision the district court included as an *accommodation* to Google. The district court accepted Google's argument, 9-ER-2044-47, that it should be permitted to review the third-party app stores distributed on Google Play, as well as all apps on those stores. 1-ER-5. The court also agreed with Google, 9-ER-2048-49, that Google should be permitted to charge third-party stores for that review. 1-ER-5.

What Google now objects to is that the injunction permits it to charge only "a reasonable fee" that is "based on Google's actual costs". (Br.68-69.) Google contends this limit is unwarranted because there is "no established history of Google abusing the pricing of this service to restrain trade". (Br.69.) That is remarkable: the jury expressly found that Google restrained trade in Android app distribution, just through means other than pricing. And Google has loudly protested being required to carry rival app stores on Google Play. Giving Google the ability to charge whatever it wants for the review of third-party stores would enable Google to charge such a high price that no rival app store would take advantage of it, thereby nullifying this portion of the injunction.

Because the pricing constraint here is an anti-circumvention measure, Google's reliance on *Kodak* (Br.68-69) is misplaced. There, requiring "reasonable" prices was a tool through which the district court sought to restore competition, and this Court held that "non-discriminatory" prices would be a less restrictive means of doing so. *Kodak*, 125 F.3d at 1125-26. Here, the relevant tool for restoring competition is the store-distribution remedy, which is indeed non-discriminatory. The pricing limit is necessary only because Google requested to be able to charge for reviewing third-party stores.

Contrary to Google's argument (Br.68), a non-discriminatory pricing requirement as in *Kodak* would not be feasible. Kodak had a thriving parts business that it wanted to continue, where its pricing was constrained by market forces. The court could thus use Kodak's pricing for its parts customers as a basis to cabin its pricing of parts to competitors. There is no comparable benchmark to cabin Google's pricing here. Google has not been and does not want to be in the business of carrying app stores at all, so if the only requirement were non-discrimination, Google could charge everyone an equally prohibitive price— thereby defeating the remedy.[19]

---

[19] In addition, unlike in *Kodak*, which involved a pricing restriction in one market (parts) to remediate competition in another (service), the reasonableness limit here applies in the same market Google monopolized, which is an approach that *Kodak*

### C. The Injunction Is Not Excessively Vague, and the District Court Did Not Abuse Its Discretion in Appointing a Technical Committee to Address Issues that Arise.

Google's objections to the injunction's clarity and the use of a technical committee provide no basis for reversing the catalog-access and store-distribution remedies.[20]  Rule 65(d) requires only that the acts restrained or required by an injunction be described in "reasonable detail".  Fed. R. Civ. P. 65(d)(1).  This is not a demanding requirement; it provides the defendant with "fair notice" of what it may not or must do.  *Fortyune*, 364 F.3d at 1086-87.  "Injunctions are not set aside under rule 65(d) … unless they are so vague that they have no reasonably specific meaning."  *Holtzman*, 762 F.2d at 726; *see also In re NCAA Athletic Grant In-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1263 (9th Cir. 2020).  The injunction easily clears that bar.

The catalog-access provision, 1-ER-4-5, sets forth in straightforward terms that Google must "permit third-party Android app stores to access the Google Play Store's catalog of apps" and permit users to download such apps "on the same terms as any other download that is made directly through the Google Play Store".

---

recognized had support.  125 F.3d at 1125 (noting cases that "involve forced sales at reasonable prices where the defendant has restrained trade in the market for patented goods").

[20] Google does not contest any other portion of the injunction on this ground. (Br.69-74.)

1-ER-4-5.  Google may "keep all revenues" associated with such downloads and must provide developers the opportunity to opt out of catalog access.  1-ER-4-5. Google does not identify any uncertainty about the meaning of any of these terms, contending only that this provision is "silent" on certain implementation details. (Br.70.)  But an "injunction is not … in violation of Rule 65(d), even though it declines to provide [the defendant] with explicit instructions on the appropriate means to accomplish this directive." *Fortyune*, 364 F.3d at 1087.

Likewise, the store-distribution provision, 1-ER-5, provides sufficiently clear instruction.  It states that "Google may not prohibit the distribution of third-party Android app distribution platforms or stores through the Google Play Store." 1-ER-5.  Google may review such stores, and the apps they carry, using "review measures [that are] comparable to the measures Google is currently taking for apps proposed to be listed in the Google Play Store".  1-ER-5.  Again, these provisions are plainly worded and easy to understand.  Google objects that the provision requiring its "technical and content requirements and determinations" to be "strictly necessary and narrowly tailored" is not "discussed, divined, or traced back to industry practice or standards of care".  (Br.71.)  But this provision's meaning can be "traced back" two sentences in the injunction, where the court authorized Google "to take reasonable methods to ensure that" third-party stores and their apps "are safe from a computer systems and security standpoint, and do not offer

82

illegal goods or services under federal or state law within the United States, or violate Google's content standards" applicable to apps distributed directly on Google Play.  1-ER-5.  Thus, Google's measures must be necessary for, and tailored to, those expressly stated purposes.

A determined and recalcitrant litigant can always identify further questions that may need to be resolved, but there can be no doubt that Google has "fair notice" of what is required, and that the injunction is not "so vague that [it has] no reasonably specific meaning".  It therefore satisfies the requirements of Rule 65(d). *NCAA*, 958 F.3d at 1263.

That is particularly true because the catalog-access and store-distribution remedies do not take effect right away.  The district court gave Google "up to eight months from the date of [its] order to implement the technology and procedures necessary to comply with" these provisions.  1-ER-4-5.  To the extent there were any material ambiguity (which there is not), Google would have ample opportunity to get it resolved before it is at any risk of a contempt sanction.  "The fair notice requirement of Rule 65(d) must be applied in the light of the circumstances surrounding the order's entry."  *SEC v. Murphy*, 50 F.4th 832, 852 n.9 (9th Cir. 2022).  Here, those circumstances include the eight-month runway for implementation and the district court's establishment of a process for addressing in the interim the kind of "nuts-and-bolts issues" that Google has raised.  2-ER-304.

The court established a three-person technical committee to "review disputes or issues relating to the technology and processes required" by these two remedies. 1-ER-5-6. The committee mirrors a similar arrangement in *United States v. Microsoft Corp.*, No. 1:98-cv-01232-CKK (D.D.C.), Dkt. 746 at 9-13. Although Google complains that no U.S. court has previously employed such a "technical committee" in an injunction (Br.73), that is a terminological quibble; courts routinely appoint technical advisors and special masters in complex cases. *See, e.g.*, *A&M Recs., Inc. v. Napster, Inc.*, 284 F.3d 1091, 1097 (9th Cir. 2002); *Ass'n of Mexican-Am. Educators v. California*, 231 F.3d 572, 590-91 (9th Cir. 2000) (en banc). Such mechanisms are well within the district court's discretion, provided the committee does not "displace the district court's judicial role". *Napster*, 284 F.3d at 1097. Here, even as to issues within the committee's purview, "a party may ask the [district c]ourt for a resolution", and the district court will "serv[e] as the final word when necessary". 1-ER-5-6. Thus, any concerns about clarity "are further mitigated by the district court's demonstrated willingness to provide clarification where sought". *Carrillo v. Schneider Logistics, Inc.*, 501 F. App'x 713, 715 (9th Cir. 2012).[21]

---

[21] The district court's continuing oversight is also a complete answer to Google's quasi-constitutional challenge to having one member of the committee be an Epic designee. (Br.73.) While the committee, which also includes a Google designee,

### D. Google's Objection to the Absence of Additional Findings Is Meritless.

#### 1. The District Court More Than Adequately Explained the Basis For Its Injunction.

Google's final attack on the injunction is its contention that the district court did not explain itself well enough. (Br.74-75.) This should be rejected out of hand. Google identifies just one case in which an injunction was reversed on this basis, *Yowell v. Abbey*, 532 F. App'x 708 (9th Cir. 2013), and there the district court failed to make findings of fact or conclusions of law *at all*. The only other case Google cites for the proposition that injunctions are "routinely vacated" for failure to adequately explain them is *Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009), which did no such thing. This Court reversed in *Stormans* because the district court applied an incorrect legal standard in assessing liability and found the resulting injunction to be substantively overbroad—it did not reverse for failure to explain. *See id.* at 1142. The only other case Google cites that even touches this issue is *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 879 (9th Cir. 2014), where the district court wholly failed to "discuss a fact … relevant

---

may "review disputes or issues", 1-ER-5, the judicial power still rests with the district court.

to weighing the equities", which left this Court "uncertain whether the district court considered all relevant factors in assessing the balance of hardships". *Id.*[22]

The district court's detailed order, which incorporated its prior order denying judgment as a matter of law, 1-ER-7-15, more than adequately informs this Court of the basis for the decision. The court directly addressed each of Google's "main contentions with respect to the injunction". 1-ER-22.[23] The court also articulated its thinking orally at the two evidentiary remedies hearings. *See, e.g.*, 3-ER-438-41; 3-ER-448-55; 2-ER-222; 2-ER-238-39; 2-ER-326; 2-ER-350.

Of course the court did not expressly respond to each and every one of Google's *"deluge"* of *"cursory and undeveloped"* arguments, 1-ER-26-27. That is not required. *Cf. Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) (*"Judges are not like pigs, hunting for truffles buried in briefs"*). Especially not here, where Google submitted an "ocean of comments" across its 90 pages of objections to Epic's proposed injunction, after a "virtually unlimited opportunity to present its views about the scope and content of an injunction". 1-ER-8, 22-23. Requiring the court to provide detailed findings on each objection—and why each of

---

[22] The remainder of Google's description of the law (Br.74-75) plucks stray language from cases addressing issues other than how much explaining a district court must do.

[23] *See, e.g.*, 1-ER-16-17 (addressing causation argument); 1-ER-18-19 (addressing security argument); 1-ER-19-22 (addressing "duty to deal" argument); 1-ER-22 (addressing "central planner" argument).

Google's alternative remedies was insufficient—would waste judicial resources, undermine efficient resolution and encourage future litigants to raise as many objections as possible.

### 2. Google's Specific Criticisms of the District Court's Findings Are Meritless.

After the lengthy remedies proceedings, the district court entered a balanced injunction. As the court noted, it "decline[d] to impose several of the injunction terms urged by Epic". 1-ER-14. These included both conduct provisions the court did not adopt and limitations on geographic scope and temporal duration. Google nevertheless insists that the district court "fail[ed] to even to engage with less burdensome alternatives" and thereby "abdicat[ed] its most elementary duties". (Br.75-76.) This hyperbole is baseless.

Google points to two modifications to Epic's proposed injunction that it identified in a few sentences at a hearing. (Br.76-77.) For context, prior to that hearing, Google objected to Epic's proposed remedies *in their entirety*, attacking them in writing on every conceivable ground. 3-ER-573-665. The court received written and oral testimony regarding Epic's proposals and Google's objections, including the issues Google now claims the court failed to address explicitly in its written order. *See, e.g.*, 4-ER-737 (explaining why prohibiting only catalog-wide conditional agreements with developers would be an insufficient remedy). That the district court did not explicitly call out the two proposed modifications that

87

Google now fishes from the sea of other arguments Google made is not reversible error. Google should not benefit from having overwhelmed the district court with objections.[24]

Google also complains that the district court did not expressly discuss why the injunction supposedly is broader than Epic requested in two incidental respects. (Br.77.) This too is a baseless complaint. For one thing, Google is wrong on the first aspect that it mentions. Contrary to Google's assertion that Epic did not seek a prohibition on "incentives to OEMs regarding Play's specific placement on Android devices" (*id.*), that was a feature of Epic's proposed injunction. 4-ER-713 (proposing that Google be prohibited from "mandat[ing] or incentiviz[ing] the placement of the Google Play Store in any specific location on an Android device")). In any event, the district court had discretion to craft the injunction based on the extensive record it developed in the remedies proceedings and did not need to specifically mention each respect in which its final decision deviated from Epic's proposal.

_____

[24] Google's contention that the court "show[ed] a profound lack of attention" to these issues (Br.77-78) is based on a misleading truncation of the district court's order. While Google faults the court for stating that "Google itself agreed" with these portions of the remedies (Br.78), the court's order correctly goes on to note that Google agreed that the provisions "can be a part of the injunction *with certain modifications*". 1-ER-15 (emphasis added).

Next, Google asserts that the district court was required to make specific reference to a settlement Google reached with the States. (Br.79-82.) This contention is also incorrect, much less a ground for reversal. While Google contends that the States' settlement embodies the public interest, the States' settlement was a *settlement*. As in any settlement, the States necessarily balanced the relief they were able to obtain against the possibility that they might lose at trial. Moreover, the States' settlement includes a $700 million cash payment, 3-ER-689, which undoubtedly factored into the scope of equitable relief for which the States negotiated. There is no basis to conclude that the States' pre-trial compromise reflects what the States believed to be the optimal set of restrictions on Google's conduct.

The district court had before it a thorough record, including expert testimony, specifically addressing why the States' settlement would not fully remedy Google's illegal conduct. *E.g.*, 4-ER-734; 4-ER-726. The court was not required to give a detailed description of why the settlement fell short of the complete relief warranted after a verdict on the merits.[25]

---

[25] Google's reliance on *Stormans* (Br.82) is unfounded. The state officials there expressed their consideration of the public interest through rules duly adopted by state agency, *see* 586 F.3d at 1140, not settling a case in return for, *inter alia*, a cash payment.

Google's contention that the district court "failed to account" for potential security concerns (Br.82) is also incorrect. The court expressly stated that "there are potential security and technical risks involved" with some of the remedies and authorized Google "to engage in its normal security and safety processes". 1-ER-18. The trial evidence showed, however, that Google had misused security justifications as a pretext for imposing anticompetitive restraints, *e.g.,* 1-ER-46, and the jury necessarily found that Google's proffered security justifications were outweighed by anticompetitive effects. Thus, the district court reasonably placed limits on Google's future invocations of "security" as a basis for resisting remedies. *See* 1-ER-18 (requiring Google to show that limits on third-party app stores "were strictly necessary to achieve safety and security for users and developers").

Moreover, the district court had a record establishing that Google's concerns about security are overstated. *See, e.g.*, 2-ER-233-34 (Epic expert explaining that if catalog access is implemented, existing security measures remain in place and there is not "any sort of new security concern that's being brought up through this new discoverability interface"); 2-ER-247-49; 2-ER-261-62; 2-ER-288-91 ("there doesn't seem to be a legitimate security justification for Google to impose this requirement only for third-party stores distributed on Play, particularly given this context that there are already the sandboxing that we talked about during trial. The

Play Protect protections that we talked about during trial, that's all still going to be there."); 2-SER-50-57, 2-SER-60-65; 2-SER-20, 2-SER-22, 2-SER-38-42.

The court recognized that some of these security questions could benefit from further technical input and established the technical committee to review such implementation issues. Thus, Google's contention that the injunction does not "explain[] the security measures Google may take to address the concerns it raised during the remedial hearings" (Br.84) is not well-taken. Google will have ample opportunity to hammer out the specifics of those measures through the committee process, subject to the court's resolution if necessary. This appropriately balances the urgent need to remedy the ongoing effects of Google's unlawful conduct with "a healthy dose of judicial humility" about the best way to manage the technical details. *Alston*, 594 U.S. at 107.[26]

Google finally argues that the district court "disregarded" the potential objections of developers who do not want to have their apps available on certain third-party app stores. (Br.86.) The injunction specifically addresses this issue by

---

[26] Google complains in a footnote about the eight-month "timeline" for implementing the catalog-sharing and store-distribution remedies. (Br.84n.16.) It cites only the testimony of its own expert seeking 12-16 months and ignores the contrary testimony of Epic's expert, who opined that 3 months would be sufficient. 2-ER-228-29; 2-ER-241-42. The district court ultimately made a finding that the appropriate time was between the parties' proposals.

allowing developers to opt out, and Google cites no authority that an opt-out regime provides insufficient protection.[27]  Expert testimony established that an opt-out regime appropriately "puts more of an onus on this fairly uncommon developer who's bothered by this sort of thing", 3-ER-479, because as the court recognized "opting in is going to be much less effective in dealing with network effects than opting out", 3-ER-438-41 *see also* 3-ER-487.

The district court also directly examined the experts regarding opt-outs.  It correctly found that "[t]hose are one-in-a-million situations".  2-ER-259.  "A rational developer is going to want to be in every possible store that developer can reach in order to maximize distribution of the app."  2-ER-258.  Again, however, for those developers who do want to limit distribution of their app, they may opt out.

### III.  Google's Meritless "Standing" Arguments Are Not Jurisdictional, Are Waived and Fail on the Merits.

Google argues that Epic "lacks standing to seek a nationwide injunction" and challenges four of the injunction's provisions.  (Br.87-88.)  Google does not

---

[27] To the extent Google argues that a licensor must have a "role" in deciding whether a licensee can allow a third party to use the licensor's intellectual property (Br.86), Google can revise its form developer agreements, which are contracts of adhesion that Google regularly updates, to state that Google will comply with the catalog-access provision of the injunction, subject to the developer's right to opt out.

contest Epic's standing for the remainder. Google thus does not actually challenge Epic's standing, only the scope of the injunction granted. That issue is not jurisdictional, so Google waived its challenges by not making them below. They also fail on the merits.

### A. Google's Objections Are Not Jurisdictional and Are Therefore Waived.

Google does not dispute the injunction provides Epic with relief from injuries the jury found result from Google's violations. 1-ER-54, 1-ER-56-57. For example, Google's agreements with OEMs and developers prevent them from supporting competing app stores like Epic's, and the injunction prohibits that conduct. 1-ER-3-5.

Rather than challenge Epic's standing to seek *any* injunction, Google challenges the scope of the injunction. (Br.87.) This Court has rejected efforts to transform such complaints into a jurisdictional issue. Standing hinges on whether courts are "capable of" redressing plaintiff's injuries. *Kirola v. City & Cnty. of San Francisco*, 860 F.3d 1164, 1176 (9th Cir. 2017). When that "constitutional minimum" is met, *id.*, "[t]he scope of any injunctive relief ... hinges on a merits determination, not redressability", *Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 63 (9th Cir. 2024).

Google cites no case categorizing the scope of an injunction as jurisdictional. *Clapper v. Amnesty Int'l USA* holds that standing is established as

93

long as the plaintiff's injuries are "redressable by *a favorable ruling*"—not by the *specific* relief sought or obtained. 568 U.S. 398, 409 (2013) (emphasis added). When the Supreme Court holds that plaintiffs must show standing "for each form of relief", it means that plaintiffs must have "standing to seek *an* injunction", distinct from backwards-looking relief like damages. *E.g., Murthy v. Missouri*, 603 U.S. 43, 61 (2024); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

Google's complaints that the injunction is "nationwide" and benefits "third parties" have nothing to do with the standing analysis. Instead, the scope of injunctive relief is a merits issue after liability is determined. *See Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16 (1971) ("[T]he nature of the violation determines the scope of the remedy."); *see also Apple II*, 67 F.4th at 999-1000, 1002 (addressing standing separately from the scope of injunctive relief).

Google did not preserve for this Court's review challenges about whether the catalog-access or store-distribution provisions would benefit Epic. *See* 3-ER-621-36 (raising other objections to catalog access and store-distribution remedies); *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999). Google's attempt to transform waived arguments (Br.89-90) into jurisdictional challenges is particularly prejudicial because, if Google had raised them, Epic and the district court could have specifically addressed them.

### B. Google's Objections Are Also Meritless.

Each of the challenged provisions (Br.88) will redress injuries to Epic.

*Catalog Access.* Epic is an Android app developer and a customer for app distribution services. 5-ER-1182; 5-SER-981; 5-ER-1193. The Epic Games Store is also a competing Android app store that will be able to use catalog access. The catalog-access remedy is designed to help restore competition in the Android app distribution market, which the jury found Google had monopolized, causing injury to Epic. 1-ER-54; 1-ER-11-12. Enabling competitors to access Google Play's app catalog, 1-ER-4-5; 1-ER-16-17, will help rival app stores overcome Google's network effects. Undisputed evidence proved that Epic, as a developer, would benefit from such increased competition. *See, e.g.*, 5-ER-1191; 5-ER-1192; 5-SER-981-82; 7-SER-1292-99. Epic would also benefit from catalog access as a competing app store.

Google argues that these determinations depend on impermissible "guesswork" about third parties' actions. (Br.88.) Google's precedent does not support this argument. In *Murthy v. Missouri*, the Supreme Court held that plaintiffs had not proved that the defendants' conduct threatened them with future injuries because those injuries depended on third parties' unpredictable reactions to the defendants' conduct. 603 U.S. 43, 57-58 (2024). The Court did not address how third parties would react to an *injunction*, as Google argues here. Google

nowhere claims that Epic's *injuries* depend on third parties' reactions. (*Cf.* Br.88 (arguing about market participants' reactions to the injunction).)

Google's argument is also wrong on its own terms. *Murthy* distinguished "guesswork" from a showing that third parties "will likely react in predictable ways". 603 U.S. at 58. Standing does not require certainty of relief, just that the court is capable of ordering relief likely to do so. *See Nw. Requirements Utilities v. FERC*, 798 F.3d 796, 806 (9th Cir. 2015). In antitrust cases, likelihoods are evaluated by assessing how economically rational market participants will react. *See FTC v. Indiana Fed. of Dentists*, 476 U.S. 447, 456 (1986) (FTC could "reasonably rely" on "common sense and economic theory" to predict what parties would do absent constraints on competition). In *Apple II*, this Court rejected similar challenges, based on its application of economic principles. *Apple II*, 67 F.4th at 1003 (relying on assessment that consumers will switch to lower-priced options). Here, the conclusion that app stores could better compete if they could offer more of the apps consumers want (Br.88) is commonsense and grounded in the evidence. (II.A.2.)

***App Store Distribution***. Google's complaint about the store-distribution provision (Br.90) fails for similar reasons. The district court determined that this provision would help restore competition in the app distribution market in which Epic is a customer. 1-ER-18. Further, Epic will benefit from being able to

distribute its competing app store on Google Play. Google is wrong to argue that an injunction that benefits the plaintiff by also benefiting third parties is legally impermissible. *See Bresgal v. Brock*, 843 F.2d 1163, 1169 (9th Cir. 1987) ("There is no general requirement that an injunction affect only the parties in the suit."); *Gregory v. Litton Sys., Inc.*, 472 F.2d 631, 633-34 (9th Cir. 1972) ("injunctive relief ... may incidentally benefit many persons not before the court").

Google also complains that "Epic has not demonstrated that other app stores will gain market share simply because they can be downloaded through Play". (Br.90.) Google's suggestion that each provision of the injunction *alone* must remedy the effects of its conduct is wrong. *See Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) (the "ability to effectuate a partial remedy satisfies the redressability requirement"); *Matsumoto v. Labrador*, No. 23-3787, 2024 WL 4927266, at *8 (9th Cir. Dec. 2, 2024). Regardless, the evidence demonstrated that the vast majority of users find apps on Google Play. (SOC I.) Making app stores available on Google Play will make it more likely that users use them.

**Billing and Anti-Steering Policies**. Google argues that Epic faces no ongoing injury from the requirement that apps on Google Play use GPB because "Epic has not distributed apps on Play for years, and nothing requires Google to allow Epic to do so going forward". (Br.92.) Google does not support its statement that Epic ceased distributing apps on Google Play, and it is wrong. Epic

subsidiaries continue to offer apps on Google Play, and those apps remain subject to Google's anticompetitive rules.[28]  Epic therefore continues to suffer harm as a customer of Google's app distribution and billing services.  *See Apple II*, 67 F.4th at 1000 (rejecting similar argument for same reason).  Epic also faces ongoing injury as a competitor because Google's policies prevent the millions of developers on Google Play from using Epic's billing service—Direct Pay—or directing their users to the Epic Games Store.  *See id.* (again rejecting similar challenge). Google's claim that "Epic offered no evidence that its payment system is for use anywhere other than its own store" (Br.92) is incorrect.  Epic's CEO testified that every Android customer "is a prospective user of Epic's direct payment service", but for Google's conduct.  5-ER-976; *see also* 5-ER-1192-93.

Google seeks to avoid *Apple II* in two ways.  *First*, Google argues that *Apple II* "does not survive ... *Murthy*".  (Br.92.)  But *Murthy* expressly rejected the argument that it was applying a "new and heightened standard" to standing.  144 S. Ct. at 1992 n.8.  *Murthy* only reaffirmed decades-old precedent.  *Id.* at 1986-87, 1995.

---

[28] Google terminated Epic's *Fortnite* app from Google Play, but Epic's subsidiaries' apps remain.  Epic would have proven this fact had Google raised this challenge below.

*Second*, Google argues that *Apple II* addressed anti-steering provisions but did not "address payment-processing provisions". (Br.92.) If that is any distinction at all, it is one without a difference. *Apple II* concluded that, by prohibiting app developers from informing consumers about lower-priced payment options, Apple prevented consumers from learning about and using alternatives. 67 F.4th at 1000. Here, the injunction addresses both (1) developers' ability to steer consumers to alternative payment options (at issue in *Apple II*), and (2) developers' ability to directly incorporate those options into their Google Play apps (not at issue in *Apple II*). Because of consumers' greater ability to discover and use competing payment options, Epic stands to gain more, not less, than it did in *Apple II*.

## CONCLUSION

The District Court's judgment should be affirmed. In addition, because Google has no prospect of success on the merits, its pending stay motion should be denied promptly, allowing the injunction to begin benefiting consumers and developers while this Court prepares its opinion.

December 27, 2024                    Respectfully submitted,

                                     */s/   Gary A. Bornstein*

                                     Gary A. Bornstein
                                     Antony L. Ryan
                                     Yonatan Even
                                     Lauren A. Moskowitz
                                     Justin C. Clarke
                                     Michael J. Zaken
                                     M. Brent Byars
                                     CRAVATH, SWAINE & MOORE LLP
                                     375 Ninth Avenue
                                     New York, NY 10001
                                     (212) 474-1000

                                     Paul J. Riehle
                                     FAEGRE DRINKER BIDDLE
                                     & REATH LLP
                                     Four Embarcadero Center
                                     San Francisco, CA 94111
                                     (415) 591-7500

*Counsel for Plaintiff-Appellee Epic Games, Inc.*

## CERTIFICATE OF COMPLIANCE

I certify this brief contains 21,998 words, excluding the items exempted by Fed. R. App. P. 32(f), and is accompanied by a motion to exceed the page or type-volume limits pursuant to Circuit Court Rule

I certify that this brief complies with the type size and typeface requirements of Fed. R. App. P. 32(a)(5) and (6).

December 27, 2024

/s/ *Gary A. Bornstein*
Gary A. Bornstein

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system on December 27, 2024. All participants in the case are registered ACMS users, and service will be accomplished by the appellate ACMS system.

/s/ *Gary A. Bornstein*
Gary A. Bornstein